

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-20-2001

# Dunn v. Colleran

Precedential or Non-Precedential:

Docket 99-1030

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Dunn v. Colleran" (2001). *2001 Decisions.* Paper 82.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/82

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 20, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1030

JOHN WILLIAM DUNN,

Appellant

v.

RAYMOND J. COLLERAN (Acting Superintendent);
THE ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA; THE DISTRICT ATTORNEY OF
ALLENTOWN, PA.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 98-cv-00801
District Judge: The Honorable Stewart Dalzell

Argued: December 7, 2000

Before: BARRY and COWEN, Circuit Judges, and
WARD,* District Judge

(Opinion Filed: April 20, 2001)

_____
* The Honorable Robert J. Ward, United States District Judge for the
Southern District of New York, sitting by designation.

Arthur John Kyriazis, Esquire
  (Argued)
Kyriazis and Associates
1806 Garrett Road
Lansdowne, Pennsylvania 19050

 Attorney for Appellant

Kelly B. Waldron, Esquire (Ar gued)
Douglas G. Reichley, Esquire
Deputy District Attorney
Office of the District Attorney
Lehigh County Courthouse
455 West Hamilton Street
Allentown, Pennsylvania 18101

 Attorney for Appellee

OPINION OF THE COURT

BARRY, Circuit Judge:

Our criminal justice system is bottomed on several unwavering principles. One of those principles was recognized long ago by Justice Sutherland when he stated that a prosecuting attorney

> is the representative not of an or dinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, ther efore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor--indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain fr om improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88-89 (1935), overruled on other grounds, Stir one v. United States, 361 U.S. 212 (1960). Justice Sutherland's words continue to guide us.

I.

John William Dunn inflicted grievous injuries on his infant son. In exchange for his plea of nolo contendere, the prosecutor promised, among other things, to recommend a minimum sentence within the standard guideline range of 36-60 months. At sentencing, however, the pr osecutor did not mention the standard guideline range, much less a minimum sentence within that range, arguing instead that while she could not ask the Court to impose the"maximum possible penalty," "a lengthy term of incarceration is necessary" -- a "penalty that's considerable." Dunn was sentenced to seven and one-half to twenty years imprisonment. He argues, and we agree, that the prosecutor did not adhere to the ter ms of the bargain she struck with him. We further find that the state court unreasonably applied clearly established Supr eme Court caselaw, and that the District Court erred in concluding otherwise. Accordingly, we will reverse.

Dunn was charged with aggravated assault, simple assault, reckless endangerment and endangering the welfare of a child stemming from his February 10, 1992 assault on his two month-old son, John. On that day, Dunn was left to care for his son while his wife was at work. When Mrs. Dunn returned home in the evening, she found her son moaning, rigid and non-responsive. The infant's head was limply hanging down and to the right, and his eyes were half-closed. When pressed as to what happened, Dunn became angry and when he lear ned his wife had called the pediatrician, he became enraged and shattered a living room window. He initially refused to drive Mrs. Dunn and his son to the pediatrician's office, acquiescing only when she threatened to call a lawyer.

After examining the infant, the pediatrician immediately admitted him to the hospital. The next day, Dunn admitted to Detective Dean Schwartz that his son had been crying

and that Dunn had "lost it," became frustrated, and "started to strike the child harder and har der and harder." A471. He said that after he struck his son, he wrapped him in a blanket, put him in his crib, let him cry for hours, and never sought medical treatment. In what can only be described as a massive understatement, he posited that perhaps he was not the best person to watch a sick infant because he was a recovering alcoholic.

The infant was diagnosed with shaken baby syndr ome and remains severely disabled to this day. At the time of sentencing, Mrs. Dunn testified that her then-fifteen month old son requires continual nursing car e at home because he suffers seizures, cannot see, is in tr emendous pain, is fed through a gastrointestinal tube, vomits all the time, is at constant risk of aspirating on his own mucous, has his blood drawn constantly, cries for several hours at a time, and is unable to grab for a toy, sit up, roll-over or even reach for his mother. At that time, it was expected that death was imminent. Despite the grave prognosis, John Dunn is now 8 years old, with permanent brain damage and facing numerous surgeries.

Dunn was released on bail shortly after his arr est and filed a motion to suppress his incriminating statement. Pursuant to an unwritten plea agreement and, coincidentally, on the one-year anniversary of the assault, Dunn withdrew that motion and pleaded nolo contendere to aggravated assault and endangering the welfar e of a child. That agreement was described at the plea hearing in the following colloquy between the prosecutor and the Court:

> [Prosecutor] . . . There is an agreement of sorts in this case, Judge.
>
> The Commonwealth is going to be requesting the Court impose consecutive sentences on the two counts, as they do not merge. However, I'd like for the sentencing in the endangering to be a consecutive term of probation, so that after any parol [sic] supervision is terminated, we have

4

an extra period of supervision on
this defendant.

Court: All right. It's my understanding,
Mr. Dunn --

[Prosecutor] Judge, there's one more thing. The
Commonwealth is recommending
a minimum in this case on Count
1 within the standard range,
standard guidelines range, but
that is not binding on the Court.

A460–A461. The Court later explained to Dunn:

Court: Now, what is not binding on the
Court and is left totally to the
discretion of the Court as far as
sentencing, the Commonwealth
indicates that they will
recommend consecutive sentences.
There will be a recommendation of
a sentence of a minimum which
would be in the standard range,
and that the second, the
endangering the welfare of
children, would be a sentence of
probation. However, that is not
binding on the Court in any way.
That is something which is
entirely up to the Court, that your
counsel has indicated --

[Defense Attorney]: Judge, if I could just interrupt.
That isn't what the plea bargain is.
The probation on the consecutive
on the endangering is binding.

Court: Is that binding?

[Prosecutor] Yes, Judge, I'd like to see some
extended supervision of this
defendant after any kind of jail
and parole supervision.

5

Court: What you're saying is that the Commonwealth is requesting, but you said it wasn't binding.

[Prosecutor] Judge, the sentence as to Count 1, aggravated assault, is there -- there is a non-binding recommendation. As to Count 4, I'd like to see [a] binding recommendation to probation because I would like to ensure extended supervision.

*   *   *

Court: All right. Now, let's go through that again so there's no misunderstanding here. As I indicated, a plea of nolo contendere to Count 1 and count 4. The aggravated assault and the endangering the welfare of children, that the other two counts would be withdrawn. Likewise, binding on the Court would be that it would be a consecutive sentence, the second sentence being the endangering the welfare of children, and binding on the court would be that it be a sentence of probation on that charge. Now, if we were not to accept that binding agreement which we have not participated in, then you would have a right to withdraw your plea of guilty.

Now, the Commonwealth has recommended, but it is not binding on the Court, that on the charge of aggravated assault that the sentence be -- that the minimum sentence be in the standard range of sentencing.

6

> However, as your counsel
> indicated, it's not binding, and the
> sentence could be less than that
> and likewise, it could be even
> more. Do you understand that?
>
> Dunn: Yes, Your Honor.

A462-A464.

Dunn was sentenced on April 8, 1993. At the beginning
of the sentencing proceeding, the contours of the plea
agreement were again articulated by the sentencing judge
who clearly understood what -- at least at that point in
time -- the Commonwealth's recommendation was expected
to be.

> Court: At the time of the entry of the
> plea, there was a plea bargain
> arrangement that the counts of
> recklessly endangering another
> person and the simple assault
> would be withdrawn. The
> Commonwealth also indicated that
> they would recommend a
> minimum sentence in the
> standard range, although this was
> not binding on the Court. In this
> instance, the range would be 36 to
> 60 months. So it was the
> Commonwealth's recommendation
> that the minimum sentence be in
> that range, but that it was not, as
> I indicated, not binding on the
> Court. There was a binding
> agreement that the sentence on
> Count 4 run consecutive.
> However, that was to be a
> sentence of probation which was
> binding on this Court if the Court
> would accept the plea bargain
> arrangement.
>
> [To the Prosecutor] is that your

7

        understanding of the plea
        agreement?

        [Prosecutor] Yes, your Honor .

        Court: [To Defense Attorney] is that your
        understanding of the plea
        agreement?

        [Defense Attorney] Yes, your Honor.

A87-A88.

The Court then heard testimony from a number of
witnesses. For the Commonwealth, Mrs. Dunn testified that
Dunn had a drug problem before they wer e married, had a
drinking problem throughout their marriage, and was often
physically abusive towards her. She also confirmed that
prior to the February 10th incident, she told Dunn never to
"shake a baby vigorously, because it can cause severe brain
damage." Detective Schwartz told the Court that he
disagreed with the Commonwealth's recommended sentence
and recommended that Dunn be imprisoned for at least five
years and as much as the legal maximum -- "the steepest
that the Court can give is what I recommend. It's just an
unbelievable case." A419.

On Dunn's behalf, his sister testified that Dunn needed
to come to terms with what he did to his son as well as deal
with his emotional and substance abuse problems. The
chaplain at the Allentown Rescue Mission, wher e Dunn
lived for some time during the pendency of his case,
testified that although Dunn was cooperative while living at
the Mission, he was emotionally troubled, depr essed and
suicidal. The chaplain attributed Dunn's emotional trouble
to his stint in the United States Army and the death of his
father. With respect to the assault on the infant, the
chaplain indicated that Dunn did not understand how
patting his son on the back to raise a burp could have
caused severe brain damage. Another employee of the
Rescue Mission also testified that Dunn was emotionally
troubled. He said that Dunn still believed that his pats on
his son's back did not cause the infant's sever e brain
damage and regretted not having the r esources to prove
that at trial.

8

Finally, Dunn testified that he did not know at the time that his son was injured. Indeed, he continued, he remained mystified that patting his son on the back could have caused such severe brain damage without leaving so much as a bruise. Dunn conceded his problems with drugs and alcohol as well as his unresolved feelings about his father's death and hoped that he might one day live a normal life.

After hearing this testimony, the Court called upon counsel:

> Court: Do Counsel wish to say anything further?
>
> [Prosecutor] Yes, Judge. I answer your question yes and I don't even know what to say, Judge. What I know is, I know the injuries of the child. I know the loss to the family. What I know is the reasons for this plea. I think it's pretty clear that I wanted to resolve this in a plea. I didn't want these parties, particularly, I didn't want Grace [the mother of the infant] to go through trial, testimony, the possibility of any kind of verdict as the result of a trial. I wanted to be able to have this situation put behind everyone.
>
> On the other hand, Judge, there is so much that I feel about this situation. I feel that we've heard a carload of excuses for his behavior, or for his condition, meaning the defendant. I don't believe that the acts that occurred that Monday were intentional. Yet the statute read[s] reckless. And by this reckless conduct, this child will never have a life. This mother will face a possibility of losing her child some day, prematurely, to say the least. She

9

suffers with this child everyday, Judge, in a way that no one should ever have to suffer; watching a child in constant pain and discomfort.

And I have not heard, nor read anything, either in this proceeding, or in this presentence investigation, that demonstrates to me that this defendant has even the most remote understanding or compassion for that. All we hear about is him. I've not heard much about his concern for the child, his concern for their condition. You heard Grace talk about the fact that she is the sole support, now, for herself and her child. The medical situation worsens, the insurance situation worsens. And there's not much care on the part of the defendant.

I've heard, ironically, this excuse. I don't mean to minimize it, everyone has problems, that perhaps the death of his father plays in who he is. And all I can think of is, isn't it ironic that here was the opportunity for this man to have his own son and to establish a different kind of father/son relationship. And that's totally ruined and impossible. And so I don't know that I can accept the relationship of a father and a son as an excuse for destroying another relationship between a father and a son.

I can't ask you to impose the maximum possible penalty. That would go outside of what my initial recommendation was. And I think if I

10

would have a chance to sit down and have a drink of water and calm myself, maybe I would even think that to ask for the absolute maximum is unjust. But I believe this was reckless conduct. Unfortunately, it resulted in irreparable devastation. But I think a lengthy term of incarceration is necessary to address what happened here, to get this man's attention, to get his focus in line, as to what he has to do, what he did do, what he needs to do to move on with his life. And maybe to give this woman just five minutes of peace of mind. . . .

 I think that all of these parties have spoken from the heart, Judge, and I wouldn't want to be in your shoes for all the tea in China. But I think that something has to be done. It's unfortunate that I didn't hear remorse. I heard remorse for one's own situation, one's own future. But I didn't hear remorse for what happened here. And I can't abide by that. And I'm very sorry that I didn't hear that. And I would ask that you consider, Judge, a penalty that's considerable and one that will hopefully move this defendant's behavior in line with what we find socially acceptable, because this is not.

A143–A146. The Court then sentenced Dunn on the aggravated assault charge to not less than seven and one-half years and not more than twenty years to be served in a correctional institution designated by the Deputy Commissioner for Treatment. On the endangering count, Dunn was sentenced to a consecutive term offive years' probation. The Court explained that the sentence exceeded

11

the guidelines because of Dunn's violent past, the especially heinous nature of the crime, Dunn's failur e to seek medical assistance after the incident, and the prognosis that the infant would have a limited life.

Dunn thereafter filed a petition for post-conviction collateral relief challenging, among other things, his counsel's failure to object to or seek a r emedy for the prosecutor's breach of the plea agr eement at sentencing. In denying the petition, the Court explained that the Commonwealth was obligated only to recommend a non-binding sentence in the standard range. The Court stated that it was well aware of the Commonwealth's recommendation and that the prosecutor's r equest for a "lengthy" period of incarceration was consistent with the plea agreement because a sentence within the standard range was, indeed, lengthy.

Dunn appealed from the order denying his petition. The Superior Court affirmed, and found, as r elevant here, as follows:

> Initially, we note that a sentence in the standar d range of the guidelines, as set forth at sentencing by the court, would have called for a term of imprisonment of three to five years imprisonment. This ter m can be viewed as "lengthy" in and of itself. Thus, by recommending a "lengthy" term of imprisonment the district attorney did not violate the ter ms of the plea agreement. Furthermore, three sentences before the contested remark, the district attorney stated, "I can't ask you to impose the maximum possible penalty. That would go outside of what my initial recommendation was." Thus, the district attorney clearly qualified the contested remark by indicating his [sic] recommendation was still intact.

A273-A274 (internal citation omitted). The Court further found that there was no prejudice because the sentencing court was well aware of the Commonwealth's recommendation. The Supreme Court of Pennsylvania denied review.

Dunn filed a timely petition pursuant to 28 U.S.C.S 2254 in the U.S. District Court for the Eastern District of

Pennsylvania again challenging the prosecutor's conduct at sentencing. Adopting the report and recommendation of the Magistrate Judge, the District Court concluded that because the plea agreement permitted the Commonwealth to recommend a minimum sentence of between 36 and 60 months and such a sentence was "lengthy" compared to the mean minimum sentence imposed for aggravated assault, the prosecutor's request for a "lengthy" sentence did not breach the agreement. Finding, however , that this conclusion was "by no means free from doubt," the District Court sua sponte granted a certificate of appealability.

II.

It is wholly understandable that the prosecutor was exasperated if not outraged following Dunn's pr esentation at sentencing, a presentation which evidenced his utter failure to accept responsibility for the savagery he inflicted on his infant son. Indeed, we have felt those same emotions in similar circumstances. And while we accept the prosecutor's representation that her statements at sentencing were not motivated by ill will, the motive of the prosecutor is of no moment because it is the br each and not the intent behind the breach which causes the error. We, therefore, move to the only issue before us: whether the state court unreasonably applied clearly established federal law when it determined that the prosecutor did not breach the plea agreement.1

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act (AEDPA), P .L. No. 104–132, 110 Stat. 1214, which "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." Williams v. Taylor, 529 U.S. 362, 399 (2000)

_____

1. Dunn raises a number of other challenges to his conviction. Because he never requested nor received a certificate of appealability as to those issues, we address only the question of whether habeas relief should issue if the Commonwealth breached its plea agr eement. 3d Cir. LAR22.1(b) ("If the district court grants a certificate of appealability as to only some issues, the court of appeals will not consider uncertified issues unless petitioner first seeks, and the court of appeals grants certification of additional issues.")

13

(Opinion of O'Connor, J.). Because Dunn filed his habeas petition after the effective date of the AEDPA, we are required to apply that statute's requirements. Predominant among them is the requirement that federal courts give greater deference than before to factual findings and legal determinations of the state courts, with federal habeas corpus relief to be granted only if the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. SS 2254(d)(1) and (2).2

In Williams, the Supreme Court held that under the "contrary to" prong of 2254(d)(1), the writ may issue if the state court came to a legal conclusion opposite to that reached by the Supreme Court, or if the state court decided a case differently than the Supreme Court has on "materially indistinguishable facts." Williams, 529 U.S. at 412–413; see also Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000). The Court also held that under the latter prong of 2254(d)(1), the writ may issue if the state court identified the correct governing legal principle but unreasonably applied that principle. Williams, 529 U.S. at 412–413. To make such a finding, the habeas court must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409; see also Ramdass v. Angelone, 120 S.Ct. 2113, 2120 (2000). As we recognized in Werts, "the Supreme Court stressed that an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly

_____

2. Factual findings of the state courts are presumed correct and it is the petitioner's burden to rebut the presumption by clear and convincing evidence. 28 U.S.C. S 2254(e)(1). Factual findings are not at issue here.

14

established federal law was also unreasonable." Werts, 228 F.3d at 196. Dunn challenges the state court's adjudication only under the latter prong of 2254(d)(1) --"unreasonable application" -- and our analysis will be r estricted to whether the state court unreasonably applied clearly established federal law.

Before we can determine whether ther e was, in fact, an objectively unreasonable application of clearly established federal law, we must identify the appropriate Supreme Court precedent. Williams, 529 U.S. at 412-413; see also Werts, 228 F.3d 178 (looking dir ectly to Supreme Court precedent on question of ineffective assistance of counsel claim). The standards controlling adher ence to a plea agreement were set forth long ago by the Supreme Court in Santobello v. New York, 404 U.S. 257 (1971). In Santobello, in exchange for the defendant's plea of guilty, the prosecutor agreed to make no sentencing r ecommendation. At sentencing, however, a new prosecutor (apparently ignorant of the first prosecutor's pr omise) recommended the maximum one-year sentence. Defense counsel objected to this recommendation and sought an adjour nment. The sentencing judge denied that request and stated that he was not at all influenced by the prosecutor's recommendation. The Court then imposed the maximum one-year, recommended term. On appeal, the conviction was affirmed.

The Supreme Court vacated the judgment and r emanded the case. The Court held that a guilty plea "must, of course, be voluntary and knowing and if it was induced by promises, the essence of those promises must in some way be made known." Id. at 261-262. The Court further held that

> [t]his phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insur e the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agr eement of the prosecutor, so that it can be said to be part of the

15

> inducement or consideration, such promise must be
> fulfilled.

Id. at 262.3 The inadvertence of the breach, the Court held,
did not "lessen its impact" and, even absent prejudice at
sentencing, "the interests of justice and appropriate
recognition of the duties of the prosecution in relation to
promises made in the negotiation of pleas of guilty will be
best served by remanding the case to the state courts for
further consideration." Id. at 262-263.

Thus, in Santobello, the Supreme Court clearly
established that a prosecutor may enter into a plea
agreement but, after doing so, must fulfill the promises
contained therein. If the prosecutor fails to do so, whether
purposefully or inadvertently, that breach must be
remedied regardless of whether the defendant was
prejudiced thereby.4 Under the limited review we are
permitted under the AEDPA, we must decide whether the
prosecutor breached the plea agreement and whether the
state court's adjudication to the contrary was an
unreasonable application of Santobello. As we have already
suggested, we answer each of these questions in the
affirmative.

_____

3. This Court has, of course, followed Santobello when called upon to
review federal convictions. See, e.g., United States v. Nolan-Cooper, 155
F.3d 221, 236 (3d Cir. 1998)("Because the defendant, by entering into
the plea, surrenders a number of her constitutional rights, `courts are
compelled to scrutinize closely the promise made by the government in
order to determine whether it has been performed.' ")(quoting United
States v. Hayes, 946 F.2d 230, 233 (3d Cir. 1991)); United States v.
Moscahlaidis, 868 F.2d 1357, 1361 (3d Cir . 1989)(recognizing that
Santobello requires a prosecutor to keep his promises).

4. In United States v. Benchimol, 471 U.S. 453 (1985) (per curiam), the
Court held that, unless agreed to by the pr osecutor, an agreement to
recommend a particular sentence under Rule 11 of the Federal Rules of
Criminal Procedure did not requir e the prosecutor to make his
recommendation "enthusiastically" or explain the reasons for his
recommendation. Id. at 455-456. The allegations here, however, focus
not on a less than enthusiastic recommendation or a failure to explain
the reasons for the recommendation, but on the fact that the promised
recommendation was not forthcoming.

16

When a criminal defendant claims that the gover nment breached its plea agreement, the first step is to define what the government agreed to do. To appreciate the parameters of the Commonwealth's agreement, one must first understand the sentencing scheme in Pennsylvania. Unlike the federal sentencing scheme under which a defendant is sentenced to a fixed number of months in prison, in Pennsylvania, a defendant sentenced to confinement must be sentenced to both a minimum and maximum sentence. 42 Pa.C.S.A. S 9756(a) and (b); Stewart v. Pennsylvania Bd. of Probation and Parole, 714 A.2d 502, 505–506 (Pa. Commw. Ct. 1998) (describing the sentencing scheme as doling out indefinite/indeterminate sentences with a minimum and maximum term); Commonwealth v. Barziyk, 629 A.2d 211, 215 (Pa. Super. Ct. 1997); Commonwealth v. Cain, 637 A.2d 656, 659 (Pa. Super. Ct. 1994). To determine the minimum sentence, a court consults Pennsylvania's sentencing guidelines, which include a matrix to determine a mitigated range, standar d range and aggravated range for the minimum sentence. Coss v. Lackawanna County District Atty., 94–CV–1481, 2000 WL 1372871, *5, and n.6 (M.D. Pa., Aug. 23, 2000); Commonwealth v. Adams, 694 A.2d 353, 354 (Pa. Super. Ct. 1997). The standard range designated in the sentencing guidelines is the standard range for the minimum sentence. 204 Pa. Code S 303.11 and 303.16 (setting forth ranges of minimum sentences); Commonwealth v. Pittman, 737 A.2d 272, 274 (Pa. Super. Ct. 1999) (describing the guidelines as setting forth the "legal minimum period of incar ceration"); Adams, 694 A.2d at 354 (referring to the guidelines for the minimum sentence); Commonwealth v. Decker, 640 A.2d 1321, 1323 (Pa. Super. Ct. 1994). The maximum is set by statute and the minimum sentence cannot exceed half of the maximum sentence imposed. 42 Pa.C.S.A. S 9756(b); Cain, 637 A.2d at 659. The parties agree that the standard range for Dunn's minimum sentence was 36–60 months.

Although the plea agreement in this case was not written, it was distilled many times; indeed, the Commonwealth does not dispute that it agreed to recommend that Dunn's minimum sentence be in the standard range of minimum sentences, i.e., 36–60 months. Over and over again, that obligation was articulated: "The Commonwealth is

recommending a minimum in this case on Count 1 within the standard range, standard guidelines range, but that is not binding on the Court"; "There will be a recommendation of a sentence of a minimum which would be in the standard range;" "The Commonwealth has r ecommended, but it is not binding on the Court, that on the char ge of aggravated assault that the sentence be -- that the minimum sentence be in the standard range of sentencing. . ."; "The Commonwealth also indicated that they would recommend a minimum sentence in the standar d range, although this was not binding on the Court. In this instance, the range would be 36 to 60 months. So it was the Commonwealth's recommendation that the minimum sentence be in that range, . . ." A462-464, A389. Parenthetically, and contrary to Dunn's contentions, the Commonwealth did not agree to recommend the minimum sentence of 36 months or a minimum sentence at the lower end of the standard range.

Dunn argues that the prosecutor failed to recommend what she had agreed to recommend but, rather, asked the court to impose a "lengthy" -- a "considerable" -- sentence. He further argues that this breach was exacerbated by the remainder of the prosecutor's comments which made an end-run around her obligation with refer ence to the promised recommendation. In response, the Commonwealth argues there was no br each because "lengthy" described, albeit not explicitly, the agreed-upon minimum sentence of 36 to 60 months and the pr osecutor's request for such a sentence did not convey to the Court that she sought a longer sentence.

We disagree. Dunn bargained for the recommendation of a minimum sentence within the standard range of minimums -- nothing more, nothing less. As a result, he could reasonably expect that the prosecutor would argue for a minimum sentence as low as three years or as high as five years. What he could not expect was that the prosecutor would seek a minimum sentence beyondfive years. This is precisely what the prosecutor did, sliding down a slippery slope on her way to denouncing her legal obligation.

18

Instead of recommending even a five year minimum term, the prosecutor chose to use the vague, yet loaded, words "lengthy term of incarceration" and"a penalty that's considerable" -- a term of imprisonment she described as necessary to get Dunn's attention. She did not qualify this request in any respect and did not even mention the words "minimum" or "standard range." Mor eover, a "lengthy term of incarceration" -- "a penalty that's considerable" -- could surely have meant something very differ ent from (and, from Dunn's point of view, much worse than) the pr omised recommendation of a minimum sentence of between 36 to 60 months, particularly where Dunn was exposed to a sentence of ten to twenty years. Lest there be any doubt, the import of what the prosecutor was seeking was clear when she said:

> I can't ask you to impose the maximum possible penalty. That would go outside of what my initial recommendation was. And I think if I would have a chance to sit down and have a drink of water and calm myself, maybe I would even think that to ask for the absolute maximum is unjust. But I believe this was reckless conduct. . . .

A145. By referring to her obligation under the plea agreement as only her "initial recommendation;" expressing her personal reservations about that agr eement and asking for a "lengthy" -- a "considerable"-- sentence; and stating that if given more time to reflect she might think that the "absolute" maximum would be unjust, thus implying that at that point in time the maximum was just, the prosecutor unequivocally communicated to the Court that she disavowed her earlier recommendation and now believed, as Detective Schwartz had testified, that something up to the maximum sentence allowable by law would be an appropriate sentence. The totality of the pr osecutor's remarks compels the conclusion that her failur e to affirmatively recommend a minimum sentence within the standard range had but one purpose: to influence the Court to impose a minimum sentence far greater thanfive years.

The fact that, at least as of the outset of the sentencing hearing, the Court was aware of what the pr osecutor was obliged to recommend does not excuse the Commonwealth's

19

failure to fulfill that obligation. W e can, of course, imagine sentencings at which articulating a recommended sentence in haec verba would be redundant or , for some other reason, unnecessary and, therefore, not required as long as it can fairly be said that the sentencing court had the recommendation before it when sentence was imposed. Here, however, it appears that what transpired at the sentencing hearing prompted the prosecutor's impassioned statement, a statement which not only did not articulate or even hint at the promised recommendation, but was inconsistent with that promised recommendation.

Although Santobello did not establish a bright-line test by which to determine when a prosecutor has reneged on a plea agreement, the Court made clear that, at a minimum, when a prosecutor makes a promise which induced, at least in significant part, a guilty plea -- or , as here, a plea of nolo contendere -- the pr osecutor's promise must be fulfilled. Because no conclusion can be drawn other than that this prosecutor did not, in Santobello 's word, convey even the "essence" of that promise, she breached both the letter and the spirit of her agreement. W e conclude that the Superior Court's determination that the pr osecutor did not breach the plea agreement involved, in the words of the AEDPA, "an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1).5

III.

Having found that the state court unreasonably applied Santobello, we must consider what, if any, r emedy is appropriate. The Commonwealth, rigid in its position that it did not breach the plea agreement, has not discussed the issue of remedy. For his part, Dunn argues that the harmless error rule does not apply and we are "duty bound" under Santobello to grant him r elief regardless of

_____

5. We note that the Superior Court found that a sentence in the standard range of 36-60 months was "lengthy" and that, in any event, the prosecutor "qualified" her call for a lengthy term by indicating that her initial recommendation was "still intact." The prosecutor, of course, indicated no such thing.

20

whether the sentencing court was influenced by the Commonwealth's breach. We agree that Santobello requires relief, as does this Court's precedent.

The Supreme Court made quite clear that it did not need to "reach the question of whether the sentencing judge would or would not have been influenced" by the terms of the plea agreement had the agreement not been breached. Santobello, 404 U.S. at 262. Rather, the Court concluded that

> the interests of justice and appropriate r ecognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty will be best served by remanding the case to the state courts for further consideration. The ultimate relief to which petitioner is entitled we leave to the discr etion of the state court, which is in a better position to decide whether the circumstances of this case r equire only that there be specific performance of the agreement on the plea, in which case petitioner should be resentenced by a different judge, or whether, in the view of the state court, the circumstances r equire granting the relief sought by petitioner , i.e., the opportunity to withdraw his plea of guilty.

Santobello, 404 U.S. at 262–263. Indeed, the Supreme Court's decision to remand the case despite the sentencing court's explicit statement that it had not been influenced by the prosecutor's recommendation leaves little room to argue that the harmless error rule applies.

The rationale for this is evident. By entering into a plea agreement, a defendant voluntarily and knowingly surrenders a plethora of constitutional rights in exchange for a commitment by the prosecutor to do or not do certain things. When the prosecutor breaches that agreement, he or she violates the defendant's due process rights by implicating the consideration and voluntariness upon which that plea was based. Mabry v. Johnson, 467 U.S. 504, 509 (1984)("It follows that when the pr osecution breaches its promise with respect to an executed plea agreement, the defendant pleads guilty on a false premise, and hence his conviction cannot stand: `[W]hen a plea rests

21

in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.' ") (quoting Santobello, 404 U.S. at 262). Especially when the prosecutor's promise is not binding on the court, the defendant does not bargain for a specific sentence but for a lock on what the prosecutor can do and say at sentencing. That the sentencing court does not follow the prosecutor's lead is irrelevant. A defendant's constitutional rights are violated when a prosecutor r eneges on the consideration underlying the defendant's plea of guilty. United States v. Camarillo–Tello, ___ F.3d ___, 2001 WL 6711 (9th Cir., Jan. 3, 2001).

Breach of a plea agreement by a pr osecutor also strikes at public confidence in the fair administration of justice and, in turn, the integrity of our criminal justice system in which a vast number of cases are resolved by plea agreement. United States v. Van Thournout, 100 F.3d 590, 594 (8th Cir. 1996) (noting that this is a concern for federal prosecutions) (citing to United States v. Carter, 454 F.2d 426, 428 (4th Cir. 1972)); State of W est Virginia v. Palmer, 524 S.E.2d 661, 665 (S. Ct. W. Va. 1999) (noting same concern with respect to state prosecutions). Thus, we have held that "the doctrine that the government must adhere to its bargain in the plea agreement is so fundamental that even though the government's breach is inadvertent and the breach probably did not influence the judge in the sentence imposed, due process and equity r equire that the sentence be vacated." United States v. Hayes , 946 F.2d 230, 233 (3d Cir.1991) (internal quotations omitted); see also Williams, 529 U.S. at 375 (although not all constitutional errors warrant issuance of the writ, "err ors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ."); United States v. Nolan–Cooper, 155 F.3d 221, 236 (3d Cir. 1998) (breach of plea agr eement requires remedy regardless of harmless error rule).

When we find, on review, that a federal pr osecutor has breached a plea agreement, we generally leave the remedy to the discretion of the district court. United States v. Badaracco, 954 F.2d 928, 941 (3d Cir . 1992) (noting general

22

rule but ordering resentencing because the defendant had already served a considerable portion of his sentence); United States v. Moschahlaidis, 868 F.2d 1357, 1361, 1363 (3d Cir. 1989) (regardless of whether the sentencing court was affected by the breach, the general rule requires sentence be vacated and the case remanded for consideration of proper remedy); United States v. Martin, 788 F.2d 184, 187 (3d Cir. 1986) (same); see also United States v. Mondragon, 228 F.3d 978, 981 (9th Cir. 2000) (holding the "harmless error rule does not apply when the government breaches a plea agreement."); United States v. Canada, 960 F.2d 263 (1st Cir. 1992) (recognizing general rule under Santobello).

It is equally appropriate when we find that a state prosecutor has breached a plea agr eement to refer the issue of remedy to the state court. Thus, this Court will not decide whether Dunn should be resentenced under the plea agreement or given the opportunity to withdraw his plea. Indeed, as the Santobello Court long ago observed, it is best left to the state court to decide what remedy is appropriate. Santobello, 404 U.S. at 263. That this case r eaches us under section 2254 also informs our decision to give the state court an opportunity to determine whether Dunn should be resentenced or permitted to go to trial. Coss v. Lackawanna County District Attorney, 204 F .3d 453 (3d Cir.) (en banc) (noting general rule of leaving proper remedy to the state in habeas petition), cert. granted, 121 S. Ct. 297 (2000).6

_____

6. Before the state courts, Dunn sought the opportunity to withdraw his plea and proceed to trial. At oral argument before us, however, it was suggested that because he has served more thanfive years (the most severe minimum sentence under the agreed-upon standard range), we should resentence him to time served. Wholly aside from the legal implications of that suggestion, the circumstances of this case cry out for state court involvement. For example, contrary to Dunn's suggestion, we do not know whether the sentencing court would have imposed a minimum sentence not to exceed five years absent a breach. Nor can we find that Dunn would have been released upon completing whatever minimum term might have been imposed because, under Pennsylvania law, a defendant who completes his or her minimum term is entitled only to be considered for parole. Accor dingly, we decline Dunn's invitation to resentence him to time served, although the state court may certainly deem it appropriate to do so. Mor eover, given that Dunn has vacillated on the relief he seeks, remand will give him an opportunity to make an informed, counseled request.

The dissent concludes, based solely on principles of comity and federalism, that the harmless err or rule applies to Santobello violations; indeed, the dissent seemingly suggests, without pausing to distinguish between constitutional violations which are trial err ors and those which are structural defects, that the har mless error rule applies across the board on habeas r eview. We are not nearly as sure as the dissent that the har mless error rule applies where a prosecutor has broken a promise made in exchange for the agreement to plead guilty and has thereby undercut the basis on which the defendant waived the host of constitutional rights implicit in his or her plea, and we are certainly sure that the harmless error rule does not apply across the board.

The Supreme Court and this Court have, on dir ect appeal, regularly treated Santobello errors as akin to structural defects not susceptible of harmless error analysis. Santobello, 404 U.S. at 262-263 (r emanding even though sentencing court stated it was not influenced by the erroneous recommendation); Nolan-Cooper, 155 F.3d at 236 (citing general rule that remand is necessary once Santobello error is found); Badaracco , 954 F.2d at 941 (same); Hayes, 946 F.2d at 233 (same). Nothing in recent Supreme Court caselaw, or in cases decided by this Court, has called this conclusion into question on dir ect or habeas review; the Commonwealth has not questioned that conclusion here; and the parties have not raised, much less briefed, the issue. Moreover, we do not worry, as the dissent seems to worry, that our conclusion vis-a-vis a Santobello violation would somehow impact much less set a far-reaching precedent for all guilty pleas, or "wall off over ninety percent of state criminal convictions fr om harmless-error analysis," Dissent at 36; indeed, we do not take issue with the dissent's conclusion that the vast majority of errors alleged in the guilty plea process would be subject to the harmless error rule. In any event, we need not reach the issue, if issue it be, of whether a Santobello violation is a structural or trial error for even if har mless error would apply to a Santobello violation, we would not find the error harmless here where, we note, the pr osecutor did much

24

more than simply, as the dissent suggests, call for a "lengthy" sentence.7

One final note. We indicated above both our belief that the prosecutor's comments were incited by Dunn's refusal to accept responsibility for his actions and our appreciation of the difficulties this sentencing presented. Nonetheless, we reiterate that Santobello does not allow a prosecutor to unilaterally repudiate his or her promises because honoring them becomes distasteful.

IV.

For the reasons stated above, we will r everse the judgment of the District Court denying the petition for a writ of habeas corpus, and remand with instructions that it issue a writ of habeas corpus ordering Dunn's r elease if the state court does not remedy the breach within 90 days of our judgment.

_____

7. The dissent speculates that the reason Dunn did not pursue a direct appeal was because, if he were to have pr evailed on appeal such that his plea was vacated, he could have been exposed to less favorable plea terms or even potential homicide charges. From this, the dissent concludes that we are "rewarding" Dunn's "tactical use of federal habeas relief." Dissent at 33. But as the various opinions in Santobello underscore, Dunn could have sought specific performance of the agreement instead of vacation of his plea with his preference, as Justice Douglas put it, accorded "considerable, if not controlling, weight." Santobello, 404 U.S. at 267. We see no"tactical" advantage here from having waited; indeed, given the result we r each, there may well have been a disadvantage.

COWEN, Circuit Judge, dissenting :

John Dunn repeatedly struck his two-month old son causing massive, permanent brain damage. Despite the child's crying and the struggling noises he made throughout the remainder of the day, Dunn did nothing to seek medical care; and when his wife retur ned home from work around 5:30 p.m., and insisted on calling a doctor, Dunn vehemently objected and pitched a bottle thr ough a window, shattering it. Not until his wife thr eatened to call a lawyer did he agree to drive her and the child to the doctor. Once prosecuted, Dunn decided to plead nolo contendere to one count of aggravated assault and one count of endangerment of the welfare of a child. In return for his plea the state prosecutor dropped two other charges, agreed to five years of probation for the charge of endangering the welfare of a child, and pr omised to recommend a minimum sentence in the standar d range for the charge of aggravated assault.

Granting Dunn habeas relief, the majority holds that the state courts unreasonably applied Supreme Court precedent in evaluating the prosecutor's compliance with the plea agreement at sentencing. The majority also suggests that harmless-error analysis does not apply to habeas review of an alleged breach of a plea agreement.

I respectfully disagree with both conclusions, and believe that the majority's opinion may have far-r eaching consequences. According to data collected by the U.S. Sentencing Commission, pleas accounted for 94.6% of all federal convictions in fiscal year 1999, 93.6% in 1998, 93.2% in 1997, 91.7% in 1996, and 91.9% in 1995. See U.S. Sentencing Commission, Datafile, http://www.ussc.gov. And similar figures undoubtedly apply to state convictions. One recent study, for example, found that less than 5% of state felony criminal cases were disposed of through jury trial. Jeffr ey Abramson, We, The Jury 252 (2000). What this data demonstrates is that a habeas decision affecting pleas and sentencing will have vastly greater impact than any influencing pr ocedure at trial.

I

The breach of the plea agreement occurr ed, according to the majority, when the prosecutor made a r ecommendation for the charge of aggravated assault. T o evaluate what the prosecutor promised for that count, it is important to understand that in Pennsylvania a convicted defendant receives a minimum and a maximum sentence. See Majority Op. at 17 (citing 42 Pa.C.S.A. S 9756(a) and (b); Stewart v. Pennsylvania Bd. of Probation and Par ole, 714 A.2d 502, 505-06 (Pa. Commw. Ct. 1998)). The minimum sentence is usually established by applying sentencing guidelines, which allow the sentencing judge to select the defendant's minimum sentence from one of three ranges--a mitigated, standard, or aggravated range. A defendant's maximum sentence, by contrast, is limited only by the statutory maximum.

In Dunn's case the standard range for the minimum sentence was 36-to-60 months, while the statutory maximum sentence was 20 years. On appeal Dunn'sfirst argument is that what the prosecutor actually agreed to do was recommend a single sentence at the bottom end of the standard range, i.e., the lowest or minimum sentence in the standard range, which is a sentence of 36 months. But as the majority concludes, this argument r ests on an incorrect interpretation of the plea agreement. Defendants do not receive a single determinate sentence under Pennsylvania law, and it is clear from the recor d that all that the prosecutor agreed to do was "recommend a minimum sentence in the standard range." App. at 87. What Dunn's argument neglects is that the term "minimum" does not refer to the low end of the standard range but to the first part of the defendant's sentence--the minimum sentence. In other words, if the prosecutor had r ecommended a particular minimum sentence near the top of the standard range, that would have been entirely consistent with the plea agreement.

Against this legal background we must evaluate Dunn's second objection, the argument that the majority accepts. Dunn maintains that the prosecutor impr operly requested a "lengthy term of incarceration" or "a penalty that's considerable." App. at 145-46. Like the pr osecutor, the

27

state courts, and the District Court, I believe that these remarks were consistent with the plea agreement. The majority acknowledges that the plea agreement did not require the prosecutor to advocate for leniency within the standard range, and there is no clearly established Supreme Court precedent for finding that the prosecutor had an implied duty to do so. Cf. United States v. Benchimol, 471 U.S. 453, 105 S.Ct. 2103 (1985) (per curiam) (rejecting that a plea agreement included an implied duty to make a recommendation enthusiastically). The prosecutor was entitled to urge, even vigorously, that the judge sentence at the high end of the range, and as both Dunn and the majority implicitly recognize, nothing limited the prosecutor from presenting compelling evidence to convince the judge to do so. The majority opinion also makes clear that the sentencing judge and the prosecutor repeatedly reviewed the prosecutor's obligation to recommend that the minimum sentence fall in the standard range, and the sentencing judge understood this point. Moreover, the plea agreement imposed no limitation at all about the maximum sentence.

When the state trial judge (the same judge as it happens who sentenced Dunn) rejected Dunn's petition for post-conviction collateral relief, the judge wrote that the prosecutor's request for a "lengthy" sentence was "consistent with the plea agreement in that the standard range of sentencing for Defendant's aggravated assault charge extended to a minimum of five (5) years of incarceration." App. at 300. The state intermediate appellate court similarly reasoned that the prosecutor's remarks were consistent with the plea agreement because the standard sentence range of three-to-five years for the minimum sentence "can be viewed as `lengthy' in and of itself." App. at 273. Expanding on this reasoning, the District Court noted in denying Dunn's habeas petition that in 1993, the year Dunn was sentenced, the mean minimum sentence in Pennsylvania for aggravated assault was 13.2 months and the mean maximum was 35.6 months. Thus, any minimum sentence in the standard range of 36-to-60 months, the District Court reasoned, "would, against these averages, be `lengthy.' " App. at 51 n.1.

28

Because Dunn's petition is governed by the 1996 AEDPA amendments to the federal habeas statute, we do not review a state court's legal determinations under a de novo standard. See Williams v. Taylor , 529 U.S. 362, 402-13, 120 S.Ct. 1495, 1518-23 (2000); Werts v. Vaughn, 228 F.3d 178, 196-97 (3d Cir. 2000). Federal courts do not exercise the same general supervisory powers over state courts that federal appellate courts do over federal district courts. We cannot grant habeas relief unless the state-court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1).

In Williams the Supreme Court devised separate legal standards for the "contrary to" and "unreasonable application of " clauses. The majority implies that it is confining itself to the "unreasonable application" standard because Dunn only challenged the state-court decision under that provision. See Majority Op. at 15. But in fact, Dunn's brief makes no such distinction between the two standards and instead states, "Whether the government violated the plea agreement is a question of law and review is plenary." Appellant's brief at 22.

The deferential "unreasonable application" standard controls "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407, 120 S.Ct. at 1520. In some cases there may be some doubt about whether the "contrary to" or "unreasonable application" clause applies, see, e.g., Hameen v. State of Delaware, 212 F.3d 226, 242 (3d Cir. 2000), but her e the state courts understood that a prosecutor is obliged to adhere to promises in a plea agreement. See Mabry v. Johnson, 467 U.S. 504, 509, 104 S.Ct. 2543, 2547 (1984); Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495 (1971). Because the state courts understood the controlling legal rule and the only question is whether the courts correctly applied that rule to these facts, there is no doubt that the"unreasonable application standard" applies. "[A] run-of-the-mill state-court decision applying the correct legal rule from our cases

29

to the facts of a prisoner's case would not fit comfortably within S 2254(d)(1)'s `contrary to' clause." Williams, 529 U.S. at 406, 120 S.Ct. at 1520.

The Supreme Court has emphasized that "an unreasonable application of federal law is different from an incorrect application of federal law." Williams, 529 U.S. at 412, 120 S.Ct. at 1522 (emphasis in original). The majority must conclude, therefore, that even though the prosecutor was entitled to advocate against leniency, and even though the prosecutor and the state judge had r epeatedly reviewed and affirmed the exact requirements of the plea agreement, the state courts were not merely incorr ect in finding that the term "lengthy" could refer to the top of the standard range, they were objectively unreasonable. Given the context of this case and that the term "lengthy" is relative, I cannot agree. Three hours, for example, is a long time for a movie but not for the flu. Likewise, just as we could properly say that a person had a "lengthy" hospital stay when he stayed ten out of a possible one-to-ten days, so too for speaking of the lengthy end of a range of 36-to-60 months of prison. Even in absolute terms, ther e is nothing improper about calling a five-year sentence "lengthy."

The prosecutor's request for a lengthy sentence did telegraph her desire that the court not be lenient, but what the majority ignores in complaining about this effect is that under the terms of the plea agreement she was legitimately entitled to say that she thought the judge should not be lenient either within the standard range or in determining a maximum sentence.

II

The majority also maintains that harmless-err or doctrine does not apply to a prosecutor's breach of a plea agreement when a state prisoner brings a habeas petition. The central problem with the majority's analysis is that it fails to distinguish the doctrine's application on dir ect review from that on habeas. In 1993 the Supreme Court held that there is a distinct harmless-error standar d that applies in federal habeas cases and imposes a "less onerous" burden for upholding the state conviction. Brecht v. Abrahamson, 507

30

U.S. 619, 637, 113 S.Ct. 1710,1722 (1993). And that lower standard applies regardless of whether the state court conducted a harmless-error review. Hassine v. Zimmerman, 160 F.3d 941, 950-53 (3d Cir. 1998) (collecting cases).1

The Supreme Court noted in Brecht  that there are numerous instances where the Court distinguishes between the relief available on direct review and that for habeas. For example, "Although new rules always have r etroactive application to criminal cases on direct r eview, we have held that they seldom have retroactive application to criminal cases on federal habeas." Brecht, 507 U.S. at 634, 113 S.Ct. at 1720 (citations omitted). Another example is that the Fourth Amendment's exclusionary rule cannot be invoked in habeas. Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037 (1976). Similarly, defendants have a right to counsel for direct appeals, Douglas v. California , 372 U.S. 353, 355, 83 S.Ct. 814, 815 (1963), but not for collateral attacks on the conviction. Pennsylvania v. Finley, 481 U.S. 551, 555-56, 107 S.Ct. 1990, 1993 (1987). After noting the many ways that relief differs under habeas--dif ferences that have only expanded since Brecht with the passage of the AEDPA--the Supreme Court explained: "The reason most frequently advanced in our cases for distinguishing between dir ect and collateral review is the State's inter est in the finality of convictions that have survived direct r eview within the state court system. We have also spoke of comity and federalism . . . . `Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish of fenders and their good-faith attempts to honor constitutional rights.' " Brecht, 507 U.S. at 635, 113 S.Ct. at 1720.

_____

1. The majority states that the parties "have not raised, much less briefed the issue" of harmless error . Majority Op. at 24. But the Commonwealth did maintain at oral argument that any putative error was harmless, and in any event we have discr etion to consider harmless error sua sponte. See, e.g., United States v. Faulks, 201 F.3d 208, 213 (3d Cir. 2000); United States v. McLaughlin, 126 F.3d 130, 135 (3d Cir. 1997); United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997); Horsley v. Alabama, 45 F.3d 1486, 1492 n. 10 (11th Cir. 1995); United States v. Langston, 970 F.2d 692, 704 n.9 (10th Cir. 1992); Lufkins v. Leapley, 965 F.2d 1477, 1481 (8th Cir . 1992); United States v. Pryce, 938 F.2d 1343, 1348 (D.C. Cir. 1991); United States v. Giovannetti, 928 F.2d 225, 227 (7th Cir. 1991).

When a constitutional challenge is focused on a state court's evaluation of sentencing and the alleged err or is harmless, these concerns with federalism and comity should be at their height. Habeas corpus, the Supr eme Court has repeatedly said, is an "extraor dinary remedy" reserved for defendants who were "grievously wronged" by the criminal proceedings. Calderon v. Coleman, 525 U.S. 141, 146, 119 S.Ct. 500, 503 (1998) (per curiam) (quoting Brecht, 507 U.S. at 633–34, 113 S.Ct. at 1719; Fay v. Noia, 372 U.S. 391, 440–41, 83 S.Ct. 822, 850 (1963)). The Supreme Court has explained that a federal court disregards these concerns with federalism and comity when it sets aside a state-court sentence without deter mining that the error had a "substantial and injurious effect." Calderon, 525 U.S. at 146, 119 S.Ct. at 503. "The social costs of retrial or resentencing ar e significant, and the attendant difficulties are acute . . . wher e the original sentencing hearing took place . . . [long ago]. The State is not to be put to this arduous task based on mer e speculation that the defendant was prejudiced. . . ." Id. (citing Brecht, 507 U.S. at 637, 113 S.Ct. at 1721).

Relief in this case is unwarranted. The state courts were reasonable to find that the prosecutor's use of the term "lengthy" was consistent with the plea agr eement given that the prosecutor retained the right to advocate for the top end of the standard range; the state sentencing judge made abundantly clear that he understood the limitations included in the plea agreement; and when sentencing Dunn to a minimum sentence of seven-and-a-half years and a maximum sentence of twenty years, the judge str essed a factor not emphasized by the prosecutor . The judge explained that he was "extremely troubled" by the fact that Dunn did nothing to seek medical advice throughout the day, despite the obvious signs of injury to his infant son. App. at 452. Worse, Dunn threatened his wife by breaking a window when she attempted to seek medical advice and would not drive her and the child to a doctor until she said she would call a lawyer. As the majority opinion details, the evidence at sentencing against Dunn was overwhelming. Dunn's wife gave the following description of her son's condition at the sentencing hearing:

32

He vomits all the time, he's in tremendous pain, he has to take a lot of medications. It's usually accompanied with vomiting. It can damage his liver if it's not monitored properly. He constantly has to have his blood level drawn. He's constantly--he has mucous and he can't clear his own mucous. He is in danger of aspirating if he inhales it all back into his lungs, which can cause pneumonia.

App. at 394. She added that her son was fed thr ough a tube into his stomach, would cry for three hours at a time, and had no motor skills at fifteen months, the infant's age at sentencing. No one disputed that the child's life expectancy was no more than two-to-seven years, and that he would require nearly constant medical care during that time. It also should be emphasized that the sour ce of harm the majority must rely upon is the differ ence in effect between what they say was impermissible--the prosecutor's use of the terms "lengthy" and "considerable"--and the word choice that undeniably would have been per missible-- a request by the prosecution for the highest minimum sentence in the standard range.

The majority's analysis is also rewarding exactly the sort of tactical use of federal habeas relief that the Supreme Court has sought to prevent. See, e.g., Brecht, 507 U.S. at 635, 113 S.Ct. at 1720-21 (citing Engle v. Isaac , 456 U.S. 107, 127, 102 S.Ct. 1558, 1571 (1982); Rose v. Lundy, 455 U.S. 509, 547, 102 S.Ct. 1198, 1218 (1982)). At Dunn's state post-conviction hearing, the trial judge engaged in the following colloquy with the lawyer who repr esented Dunn at the original plea and sentencing hearings:

The Court: There had been plea negotiations over some period of time; is that correct?

Mr. Barr: Absolutely.

The Court: And the plea negotiations or the plea that was previously offered, were there better terms in your estimation?

Mr. Barr: Yes. The longer this case went on, the worse the terms became because the child's condition became worse.

33

> The Court: I see. In other words--the condition of that child was what, Mr. Barr?
>
> Mr. Barr: Very, very serious. He had very serious brain injury.

App. at 332-33. In his findings of fact, the trial judge concluded that after Dunn was charged, he "was open to the possibility of a guilty plea and plea negotiations were conducted over a lengthy period of time. The ter ms of the agreement offered by the Commonwealth, however, became less attractive as the child's conditioned [sic] worsened. Attorney Barr believed that a plea was in Defendant's best interest as Defendant could face homicide char ges if the child were to die." App. at 296-97. It is a fair inference that the reason Dunn declined to file a dir ect appeal is that even if the appellate court agreed there had been a breach of the plea agreement (and later events show that the court thought there was no breach), the chance that the plea would have been vacated exposed Dunn to potential homicide charges at worst, and less favorable plea terms at best.

And contrary to the majority's suggestion in footnote 7, Dunn could not have been sure that if he appealed and the child died, he would be able to avoid having his plea vacated, for Santobello does not give a criminal defendant the right to choose between resentencing or having the plea vacated. Chief Justice Burger's majority opinion concluded, "The ultimate relief to which petitioner is entitled we leave to the discretion of the state court. . . ." Santobello, 404 U.S. at 263, 92 S.Ct. 499. The separate opinions in Santobello do not provide authority otherwise. Neither Justice Douglas's opinion, which no other Justice joined, nor Justice Marshall's opinion, which attracted two other votes, provides a basis for rejecting the majority opinion's rule that the lower court retains discr etion about the choice of relief.

The majority's reason for concluding that har mless error does not apply is that in Santobello--a direct-review case-- the Supreme Court said that it would remand to the state courts even though the state sentencing judge said that the prosecutor's breach of the plea agr eement did not affect the

34

sentence he imposed. Relying exclusively on this aspect of Santobello this circuit has continued to say in cases involving direct review that harmless error does not apply to a prosecutor's breach of a plea agr eement. See United States v. Nolan-Cooper, 155 F.3d 221, 236 (3d Cir. 1998) (citing United States v. Hayes, 946 F .2d 230, 233 (3d Cir. 1991) (citing Santobello)).

We have never, however, addr essed whether Santobello's conclusion about harmless error should be expanded to apply in habeas and in the teeth of the Supr eme Court's more recent decision, Brecht . Indeed, in the thirty years since Santobello was decided, there has been an avalanche of cases expanding harmless-error analysis to constitutional errors occurring during all phases of criminal trials and sentencing. See, e.g., Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827 (1999) (jury instruction's omission of materiality requirement, an offense element, was harmless error); Yates v. Evatt, 500 U.S. 391, 111 S.Ct. 1884 (1991) (harmless error applied to mandatory rebuttable presumption in jury instructions); Arizona v. Fulminante, 499 U.S. 307, 306-09, 111 S.Ct. 1246, 1263-64 (1991) (harmless error applied to coer ced confessions that were admitted into evidence); Clemons v. Mississippi, 494 U.S. 738, 752-54, 110 S.Ct. 1441, 1450-51 (1990) (applying harmless error to unconstitutionally overbroad jury instructions at the sentencing stage of a capital case); Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); Carella v. California, 491 U.S. 263, 266, 109 S.Ct. 2419, 2421 (1989) (jury instructions containing an err oneous conclusive presumption); Pope v. Illinois , 481 U.S. 497, 501-504, 107 S.Ct. 1918, 1921-23 (1987) (jury instruction misstating an element of the offense); Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101 (1986) (jury instructions containing erroneous rebuttable pr esumption); Crane v. Kentucky, 476 U.S. 683, 691, 106 S.Ct. 2142, 2147 (1986) (erroneous exclusion of defendant's testimony about the circumstances of his confession); Delawar e v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431 (1986) (unconstitutional restriction on defendant's right to cross-examine a witness); Rushen v. Spain, 464 U.S. 114, 117-18, and n.2, 104 S.Ct.

35

453, 454–55, and n.2 (1983) (denial of defendant's right to be present at trial); United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974 (1983) (unconstitutional comment on defendant's silence at trial in violation of Fifth Amendment); Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049 (1982) (unconstitutional statute forbidding trial court fr om giving jury instruction on lesser included offense in a capital case); Kentucky v. Whorton, 441 U.S. 786, 99 S.Ct. 2088 (1979) (failure to instruct jury on presumption of innocence); Moore v. Illinois, 434 U.S. 220, 232, 98 S.Ct. 458, 466 (1977) (evidence admitted in violation of Sixth Amendment); Brown v. United States, 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570–71 (1973) (admission of out-of-court statement of nontestifying codefendant in violation of Sixth Amendment); Milton v. Wainwright , 407 U.S. 371, 92 S.Ct. 2174 (1972) (confession unconstitutionally obtained).

The majority implies that harmless-err or analysis should not apply to a breach of a plea agreement because, the majority asserts, such a violation is structural err or. The majority is correct that the "Kotteakos  standard [invoked in Brecht] did not apply to `structural defects in the constitution of the trial mechanism, which defy analysis by `harmless-error' standards.' " California v. Roy, 519 U.S. 2, 5, 117 S.Ct. 337, 338 (1996) (per curiam) (quoting Brecht, 507 U.S. at 629, 113 S.Ct. at 1717). But the tr ouble with the majority's argument is that the Supr eme Court has never said violations of Santobello ar e structural error, and there is a "strong presumption" against finding that a given type of constitutional violation is structural. Rose v. Clark, 478 U.S. at 579, 106 S.Ct. at 3106. Twice in r ecent years the Supreme Court has listed the "very limited class of cases" where the error is deemed structural, see Neder, 527 U.S. at 8, 119 S.Ct. at 1833; Johnson v. United States, 520 U.S. 461, 468, 117 S.Ct. 1544, 1549 (1997), and pointedly a breach of a plea agreement in violation of Santobello was not included.

Nor is it plausible that the Supreme Court would now decide to expand the class of structural err ors, and wall off over ninety percent of state criminal convictions from harmless-error analysis on habeas r eview, particularly since pleas are not likely to concern cases involving

36

innocent defendants. The majority retorts that no far-reaching precedent is at stake because state prisoners who challenge their guilty pleas may face harmless error for claims other than an alleged breach of a plea agreement. But what viable constitutional claims besides br each of a plea agreement are available to a habeas petitioner who pleaded guilty in state court? In any event, the majority cannot obscure the impact of barring har mless-error analysis in habeas review of plea agreements by pointing out that the doctrine might apply to some other claims. The fact remains that over ninety percent of defendants enter guilty pleas, and as a result barring har mless-error analysis from habeas review of alleged br eaches of plea agreements will have a much bigger impact than barring harmless-error analysis from any rule affecting trials.

Removing breaches of plea agreements fr om harmless error may make sense on direct review, where the relevant evidence of the defendant's guilt has not gr own as stale, and where comity and federalism are not at stake, but not so for habeas review. By the time a federal court considers a habeas petition, victims who want to get on with their lives may no longer be willing to testify at sentencing, and if the plea is vacated, evidence may have disappear ed or grown stale, making it harder for the state to prove what was once an easy case. And regardless of whether the plea is vacated or resentencing ordered, granting relief forces a direct intrusion on state courts' authority even though the outcome of the state proceeding was not af fected.

Finality serves important interests and is most compelling when there was no harm fr om the alleged error. The majority's opinion reaches the wrong r esult in this case and, given the vast number of pleas in state court, creates precedent that will multiply that error many times in future cases. I dissent.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

37