# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3648

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Martin Martinez-Noriega, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 18, 2004
Filed: August 1, 2005

_____

Before COLLOTON, LAY, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Martin Martinez-Noriega pled guilty to a charge of possession with intent to distribute cocaine, and the district court[1] sentenced him to a term of 151 months' imprisonment. Martinez-Noriega contends that the district court's computation of the applicable United States Sentencing Guidelines violated his plea agreement with the United States. He also seeks to raise a claim based on the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005). We affirm.

_____

[1]The Honorable Thomas M. Shanahan, United States District Judge for the District of Nebraska.

## I.

On November 27, 2002, Omaha police officers executed a search warrant at Martinez-Noriega's residence and seized more than 200 grams of powder cocaine and $5,503 in cash. A grand jury returned an indictment charging one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1), and one count of criminal forfeiture directed at the seized currency. Martinez-Noriega then entered into a plea agreement with the government, in which he agreed to plead guilty to the drug trafficking offense and forfeit any claim to the currency.

With regard to the sentence to be imposed according to the sentencing guidelines, paragraph 10 of the agreement provided that "[p]ursuant to Rule 11(c)(1)(C), Fed. R. Crim. Pro., the parties hereby agree that you should be held responsible beyond a reasonable doubt for at least 200 grams but less than 300 grams of cocaine and, therefore, pursuant to U.S.S.G. §2D1.1, the defendant's base offense level is 20." (Add. at 4). The agreement also stated that "the parties agree that you have not met the criteria for an aggravating role but neither do you meet the criteria for a mitigating role." (Add. at 1). There was no reference in the agreement to Martinez-Noriega's criminal history category under Chapter 4 of the guidelines, or to any potential adjustment to his offense level as a "career offender" under USSG § 4B1.1.

Prior to the sentencing hearing, the United States Probation Office prepared a pre-sentence investigation report ("PSR"). The PSR recommended that because Martinez-Noriega had sustained two prior felony drug convictions, the court should apply an offense level of 32 pursuant to the career offender guideline, USSG § 4B1.1(b)(C), less three levels for acceptance of responsibility pursuant to USSG § 3E1.1(b). Martinez-Noriega objected, arguing that because his plea agreement stipulated that "the defendant's base offense level is 20," and did not refer to USSG § 4B1.1, the court was precluded from applying the career offender guideline. The

district court disagreed, and computed Martinez-Noriega's offense level as recommended by the probation office. The court thus found a sentencing range of 151-188 months, and imposed a sentence at the bottom of that range.

## II.

Federal Rule of Criminal Procedure 11(c)(1)(C) provides that the government and a defendant may enter into a plea agreement specifying that the government will "agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement)." The parties in this case designated that paragraph 10 of the plea agreement, relating to "the defendant's base offense level," was "[p]ursuant to Rule 11(c)(1)(C)." Thus, unlike a case involving an agreement of the non-binding variety under Rule 11(c)(1)(B), *e.g.*, *United States v. Gomez*, 326 F.3d 971, 975 (8th Cir. 2003), once the district court accepted the Martinez-Noriega plea agreement, it was bound to apply the recommendation concerning a base offense level. The dispute in this case concerns only how paragraph 10 of the plea agreement should be interpreted, and we review the district court's interpretation and enforcement of a plea agreement de novo. *United States v. DeWitt*, 366 F.3d 667, 669 (8th Cir. 2004).

As noted, paragraph 10 states that "the parties hereby agree that you should be held responsible beyond a reasonable doubt for at least 200 grams but less than 300 grams of cocaine and, therefore, pursuant to U.S.S.G. § 2D1.1, the defendant's base offense level is 20." The career offender guideline, which the district court ultimately applied to determine Martinez-Noriega's offense level, provides (with exceptions not applicable here) that "if the offense level for a career offender from the table in this subsection is greater than the offense level otherwise applicable, the offense level from the table in this subsection shall apply." USSG § 4B1.1(b). In Martinez-

Noriega's case, the offense level under the career offender guideline was greater than the offense level otherwise applicable. Thus, Martinez-Noriega argues that because the "base offense level" under § 2D1.1 would be rendered inapplicable if the career offender enhancement of § 4B1.1 were applied, the existence of a specific stipulation concerning the base offense level necessarily implied that his offense level would be computed without regard to § 4B1.1.

We reject Martinez-Noriega's argument because we find it inconsistent with the structure of the sentencing guidelines. *Cf.* 11 *Williston on Contracts* § 30:20, at 219 (4th ed. 1999) ("Where the subject matter of the contract between the parties lies in an area covered by federal law, they necessarily adopt, as a portion of their agreement, the applicable provisions of the particular Act of Congress."). The "Application Instructions" for use of the guidelines set forth nine sequential steps to be followed by the sentencing court in applying the provisions of the guidelines manual. The second step calls for the court to "[d]etermine the base offense level . . . contained in the particular guideline in Chapter Two." USSG § 1B1.1(b). The next three steps direct the court to apply adjustments from Chapter Three of the guidelines. The sixth step then states that the court should "[d]etermine the defendant's criminal history category as specified in Part A of Chapter Four," and "*[d]etermine from Part B of Chapter Four any other applicable adjustments*." USSG § 1B1.1(f) (emphasis added). These adjustments from Part B include the enhanced offense levels for career offenders pursuant to USSG § 4B1.1.

The guidelines contemplate, therefore, that even when a defendant ultimately is subject to an adjustment pursuant to the career-offender guideline, the court will first compute the defendant's "base offense level" under Chapter Two of the guidelines. By stipulating to a base offense level of 20 pursuant to USSG § 2D1.1, the parties in this case definitively resolved the determination called for by step two of the application instructions, § 1B1.1(b), but they did not address whether an adjustment applied at step six of the process, § 1B1.1(f), pursuant to USSG § 4B1.1.

-4-

The terminology of the guidelines supports this view. "Base offense level" is a term of art used in Chapter Two of the guidelines. Chapter Two pertains to "offense conduct," and the chapter is organized by offenses. "Each offense has a corresponding *base offense level* and may have one or more specific offense characteristics that adjust the offense level upward or downward." USSG Ch. 2, intro. comment. (emphasis added). The "base offense level" may be increased or decreased according to adjustments prescribed by Chapters Two and Three of the guidelines.

Chapter Four, by contrast, relates to "Criminal History and Criminal Livelihood." When a defendant qualifies as a "career offender," § 4B1.1 does not establish a "base offense level." Instead, notwithstanding imprecise use of terminology reflected in some of our cases, *see post* at 10-11, it sets an "offense level" that will apply if it is greater than the "offense level" otherwise applicable – that is, the "offense level" that otherwise would apply based on the "base offense level" of Chapter Two, increased or decreased by specific offense characteristics and adjustments from Chapter Two and Chapter Three. *See*, *e.g.*, *United States v. LaBonte*, 520 U.S. 751, 753-54 (1997) (explaining that the Sentencing Commission sought to implement 28 U.S.C. § 994(h) "by promulgating the 'Career Offender Guideline,' which created a table of enhanced *total offense levels* to be used in calculating sentences for 'career offenders.' . . . [The Guideline] assigns the appropriate *offense level* based on the so-called 'offense statutory maximum.'") (emphases added); *United States v. Zimmer*, 299 F.3d 710, 721 (8th Cir. 2002) ("The district court applied the otherwise applicable adjusted base offense level of 40 and not the applicable career offender offense level of 37."); *United States v. Gomez*, 271 F.3d 779, 781 (8th Cir. 2001) ("Because the offense level enhanced by the career offender provision is greater than the base offense level, the career offender offense level controls."); *United States v. Collins*, No. 03-4966, 2005 WL 1427431, at * 6 (4th Cir. June 20, 2005) ("Even if the judge had sentenced Collins at a base offense

level of twelve, the application of the career offender enhancement still would have increased his *total* offense level to a thirty-two.") (emphasis in original).

By securing an agreement that "pursuant to USSG § 2D1.1," the "base offense level" is a certain number, a defendant has solidified where he will start in Chapter Two of the guidelines, but he has not protected himself against adjustments in Chapter Four. A defendant, of course, is uniquely qualified to know his own criminal history. If he perceives a risk that his offense level may be enhanced under Chapter Four once the probation office has completed its thorough investigation of his criminal history, then he may seek to negotiate an understanding about the criminal history provisions. But he should not take comfort in an agreement that only resolves the "base offense level" under Chapter Two, because it does not bind the court with respect to Chapter Four. Accordingly, the district court did not err in applying the career-offender guideline to Martinez-Noriega.

III.

In a letter filed pursuant to Federal Rule of Appellate Procedure 28(j), Martinez-Noriega raised the possible applicability to his case of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), which was pending when this case was submitted. *Booker* held that the Sixth Amendment precludes a sentencing judge from imposing a sentence under the mandatory federal sentencing guidelines that exceeds the punishment that could be imposed based solely on facts admitted by the defendant or proved to a jury beyond a reasonable doubt (other than prior convictions). *Id*. at 756. As a remedy, the Court declared that the sentencing guidelines are effectively advisory in all cases. *Id.* at 757.

Martinez-Noriega did not challenge the constitutionality or mandatory nature of the guidelines in the district court. Thus, assuming *arguendo* that he may raise a *Booker* claim for the first time by way of a Rule 28(j) letter, we review the claim for

plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Pirani*, 406 F.3d 543, 549-50 (8th Cir. 2005) (en banc). Because the district court determined the applicable sentencing range pursuant to the career-offender guideline, which applies based on the defendant's prior convictions, this case involves no violation of the Sixth Amendment. *See Booker*, 125 S. Ct. at 756 ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."); *United States v. Marcussen*, 403 F.3d 982, 984 (8th Cir. 2005). In light of *Booker*, however, the district court's imposition of sentence did involve non-constitutional error, because the district court applied the mandatory guidelines, while *Booker* subsequently held that the guidelines are only advisory. The question presented by the supplemental filing, therefore, is whether the district court's application of a mandatory sentencing guideline range to Martinez-Noriega is a plain error warranting relief.

As our court reiterated in *Pirani*, plain error review is governed by the four-part test set forth in *United States v. Olano*, 507 U.S. 725, 732-37 (1993). *See also Johnson v. United States*, 520 U.S. 461, 466-67 (1997). In order to warrant correction, there must be an error, that is plain, that affected the defendant's substantial rights, and that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 466-67. The first two factors – an error that is plain – are satisfied here. *See Pirani*, 406 F.3d at 550. However, to demonstrate that the error affected his substantial rights, the defendant also must demonstrate that there was "a 'reasonable probability,' based on the appellate record as a whole, that but for the error he would have received a more favorable sentence." *Id.* at 552.

We do not believe that Martinez-Noriega has demonstrated such a probability. Although he was sentenced at the low end of the applicable guideline range, a low-end sentence is insufficient to demonstrate a reasonable probability that a more

favorable sentence would have been imposed absent the mandatory guidelines. *Id.* at 553. The district court did not indicate that it thought the sentence imposed was unreasonable, or that it would have imposed a lesser sentence if not bound by the guidelines. The record as a whole does not show any other basis to establish a reasonable probability of a more lenient sentence under an advisory guideline regime. To the contrary, the undisputed presentence report shows that Martinez-Noriega was a career offender under the guidelines, that he scored 15 points and qualified for criminal history category VI even without regard to his career-offender status, and that he was twice deported from the United States in 1996 and 2001 after felony convictions, only to reenter illegally and commit another felony drug offense after each removal. (PSR ¶¶ 38-46). Therefore, we conclude that Martinez-Noriega has not demonstrated a plain error warranting relief under Rule 52(b) as applied in *Pirani*.

\*     \*     \*

The judgment of the district court is affirmed.

LAY, Circuit Judge, concurring in part and dissenting in part.

- ### *Booker* **Challenge to Martinez-Noriega's Sentence**

Although I am bound by our en banc decision in *United States v. Pirani*, 406 F.3d 543 (8th Cir. 2005), I write separately to voice my agreement with Judge Bye's thoughtful concurrence and dissent in *Pirani*, 406 F.3d at 562.

A panel of this court must engage in pure speculation when reviewing these sentences, based upon often-scant lower court records which reveal little about the district judge's inclinations in any given case. It is indeed better to vacate and remand the majority of these cases to the judge who can say with surety what he or she would have done in light of *Booker*, rather than having appellate courts engage

in such guesswork. The failure or willingness of a district judge to consider a then-imaginary universe should not determine whether a defendant's sentence is reconsidered after *Booker*.

- **Application of the Career Offender Guideline**

I respectfully dissent from the majority's holding on the plea agreement issue. The district court resolved this case by relying on *United States v. Gomez*, 326 F.3d 971 (8th Cir. 2003), which the majority (and Martinez-Noriega) rightly pointed out is different than the case at bar. In *Gomez*, the defendant complained that the prosecutor promised to use a base offense level of 32. *Id*. at 974. When the sentencing court applied the career offender enhancement and raised Gomez's base offense level, this court found no error because the "sentencing stipulations in the plea agreement were clearly stated to be nonbinding on the sentencing court." *Id.* at 975. Moreover, Gomez had clearly "proffered cooperation and acceptance of responsibility in bad faith," and therefore his claim that he had been wrongly induced into pleading guilty was ill-received. *Id*. These key facts are not present in the case at bar, so *Gomez* is not analogous. It was error for the district court to rely on *Gomez* for the proposition that, as a matter of law, Martinez-Noriega's plea agreement did not foreclose application of the career offender guideline.

The majority commits a different error in affirming the district court. It resolves this case by first examining the structure of the sentencing guidelines and determining what the "guidelines contemplate." Majority opinion at 4. From there it derives the meanings of the terms to which the parties agreed. *Id.* at 5 ("By securing an agreement to a 'base offense level,' a defendant has solidified where he will start in Chapter Two of the guidelines, but he has not protected himself against adjustment in Chapter Four.").

This analytical approach is backwards. Settled law governing the interpretation of plea agreements requires us to ask first what the *parties contemplated* pursuant to contract law principles. Contract law compels this court to either enforce an offense level of twenty or void the entire agreement as contrary to express public policy.

- **The Parties' Intent as Derived From the Generally Prevailing Meaning of the Phrase "Offense Level" in the Career Offender Guideline**

Martinez-Noriega alleges that the district court erroneously interpreted the parties' plea agreement when it held that the provision in paragraph ten of the agreement, which bound the court to apply U.S.S.G. § 2D1.1 (2003), did not in any way preclude the court from sentencing Martinez-Noriega as a career offender, pursuant to U.S.S.G. § 4B1.1.[2]

When a dispute arises over the meaning of a plea agreement, the court must "discern the intent of the parties as expressed in the plain language of the agreement when viewed as a whole." *United States v. Taylor,* 258 F.3d 815, 819 (8th Cir. 2001) (italics and internal citations omitted). This analysis requires consideration of what the parties reasonably knew or understood at the time they entered into the agreement. *See* Rest. (Second) of Contracts § 202 cmt. b; *United States v. Cosimi*, 2005 U.S. Dist. LEXIS 8900 at *19 (S.D.N.Y. 2005). Where a term used in the plea agreement has a "generally prevailing meaning," that meaning controls unless a different intention is clearly manifested. Restatement (Second) of Contracts § 202(3)(a). Trade usage of a term is also highly relevant to a determination of the parties' intended meaning. *Id.* at § 202(5) ("Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with

---

[2]Martinez-Noriega did not allege that the district court's "computation" was in error. *See* majority opinion at 1.

-10-

each other and with any relevant course of performance, course of dealing, or usage of trade.").

For at least fifteen years, the generally prevailing meaning of the career offender guideline in the Eighth Circuit has been that it set a "base offense level." *See, e.g., United States v. Light*, 2005 U.S. App. LEXIS 8043 at \*13 ("Under U.S.S.G. § 4B1.4(b)(3)(B), the Armed Career Criminal provision, his base offense level was 33."); *United States v. Mohr*, 407 F.3d 898, 900 (8th Cir. 2004) (reinstated May 6, 2005) ("As a career offender Mohr's base offense level was 34 . . . ."); *United States v. Warren*, 361 F.3d 1055, 1056 (8th Cir. 2004) (opinion by J. Colloton, who now pens the majority opinion) ("the district court applied a base offense level of 37 under the career-offender guideline"); *United States v. Peltier*, 276 F.3d 1003, 1005 (8th Cir. 2002) ("[a]s a career offender, Peltier's base offense level was 34"); *United States v. Beltran*, 122 F.3d 1156, 1160 (8th Cir. 1997) ("[a]s a career offender, Beltran was subject to a base offense level of 34"); *United States v. Mendoza-Figueroa*, 65 F.3d 691, 694 (8th Cir. 1995) (en banc) ("a career offender is assigned a high base offense level"); *United States v. Ford*, 918 F.2d 1343, 1350 (8th Cir. 1990) ("the guidelines . . . permit a court to reduce a career offender's base offense level by two points if the career offender accepts responsibility").

Nor is the Eighth Circuit the only jurisdiction in which the career offender guideline is customarily assumed to set a "base" offense level. The majority of our sister circuits follow the same practice. *See United States v. Jones*, 2005 U.S. App. LEXIS 14558 (2d Cir. 2005) ("Without a Career Offender finding, Jones's base offense level would have been 12 . . . . Because of the Career Offender finding, however, the district court applied a base offense level of 32 . . . . [T]he Career Offender guideline required the district court to change Jones's base offense level in accordance with a table, see U.S.S.G. § 4B1.1(b), which sets a defendant's base offense level . . . ."); *United States v. Hawkins*, 2005 U.S. App. LEXIS 11159 at \*3 (7th Cir. 2005) ("and his base offense level as a career offender was 32. See U.S.S.G.

§ 4B1.1(b)-(c)"); *United States v. Lancaster*, 2005 U.S. App. LEXIS 13215 at \*9 (11th Cir. 2005) ("Lancaster's status as a career offender set his base offense level at 37"); *United States v. Curtis*, 2005 U.S. App. LEXIS 10852 (11th Cir. 2005) (stating that the district court "calculated Curtis's base offense level on the basis of . . . career offender status" and noting U.S.S.G. § 4B1.1(b) instructs "that the offense level be set at the greater of either the offense level for a career offender under § 4B1.1 or the offense level otherwise applicable"); *United States v. Burhoe*, 409 F.3d 5, 9 (1st Cir. 2005) ("his base offense level was computed to be 32 based on his career offender status . . . . See U.S.S.G. § 4B1.1; 18 U.S.C. § 2113(a)); *United States v. Valenzuela-Quevedo*, 407 F.3d 728, 730 (5th Cir. 2005) ("under U.S.S.G. § 4B1.1, the appropriate base offense level was 37"); *United States v. Schlifer*, 403 F.3d 849, 851 (7th Cir. 2005) ("Under the career offender guideline, Schlifer's base offense level increased to 32 and his criminal history category was VI regardless. U.S.S.G. § 4B1.1"); *United States v. MacKinnon*, 401 F.3d 8, 9-10 (1st Cir. 2005) ("MacKinnon was a career offender pursuant to U.S.S.G. § 4B1.1. MacKinnon's resulting base offense level as calculated in the PSR was 37 . . . ."); *United States v. Hondo*, 366 F.3d 363, 364 (4th Cir. 2004) ("Inclusion of these convictions qualified Hondo as a career offender under section 4B1.1 of the Guidelines, which . . . also increased the base offense levels for both the felon in possession of a firearm charge and the drug charge."); *United States v. Heard*, 359 F.3d 544, 547 n.2 (D.C. Cir. 2004) ("Guideline § 4B1.1(b) . . . mandates a base offense level of (at least) 34 when . . ."); *United States v. Chingman*, 2004 U.S. App. LEXIS 1810 at \*\*15 (6th Cir. 2004) ("Under the career offender provisions, the forty-year maximum period would have corresponded to a base offense level of 32 (U.S.S.G. § 4B1.1(b)), which would then have been reduced by three points for acceptance of responsibility, lowering the offense level to 31."); *United States v. Lawrence*, 349 F.3d 724, 726 (4th Cir. 2003) ("the district court found that Lawrence was a de facto career offender and departed from the previously calculated offense level of 22 to the base offense level of 32 for a career offender. The combination of criminal history category VI and a base offense level of 32 resulted in . . . ."); *United States v. Carter*, 2003 U.S. App. LEXIS 22747 at \*\*4

(3d Cir. 2003) ("The career offender guideline increased the defendant's base offense level to 32 which, when reduced by three levels for Carter's acceptance of responsibility, resulted in a criminal offense level of 29.").

These citations from the Eighth Circuit and other circuits cannot be passed off as the mere "imprecise use of terminology." Majority opinion at 5. The well-documented and entrenched understanding of the phrase "offense level" in the career offender guideline runs contrary to the majority's claim that "§ 4B1.1 does not establish a 'base offense level.'" *Id.* According to the prevailing meaning and custom of usage in this jurisdiction and others, §§ 2D1.1 and 4B1.1 have both been understood to set an "offense level," which is commonly called a "base" offense level under both guidelines. The only difference is that the base offense level in § 4B1.1 *supplants* the base offense level in § 2D1.1 if career offender status applies to the defendant. The totality of the various adjustments and departures then leads to the defendant's "total" offense level.

No cases cited by the majority disprove my claim as to the generally prevailing meaning of "offense level" in § 4B1.1. The majority cites *LaBonte, Zimmer*, *Gomez*, and *Collins*, *see* majority opinion at 5, to support its position. However, the quoted language from these cases does not preclude or contradict the concept of a "base" offense level in § 4B1.1. In light of the plethora of cases declaring that § 4B1.1 imposes a "base offense level," any cases cited by the majority to demonstrate the contrary only prove an ambiguity, at best.[3] Nor does the majority's reliance on

_____

[3]Of course, any ambiguity in § 4B1.1 must be construed in Martinez-Noriega's favor. "Where a plea agreement is ambiguous, the ambiguities are construed against the government." *United States v. Thompson*, 403 F.3d 1037, 1039 (8th Cir. 2005) (*citing United States v. Andis*, 333 F.3d 886, 890 (8th Cir. 2003) (en banc)); *see also* Rest. (Second) of Contracts § 206 ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words . . . ."); *Andis*, 333 F.3d at 890

-13-

*Williston on Contracts*, majority opinion at 4, aid its cause; of course the parties adopted the "applicable provisions of the guidelines." *Id.* This does not help us resolve the obvious contradiction between the majority's construction of § 4B1.1 and the construction which has generally prevailed across the nation.

Lastly, the majority's holding is just an impractical solution. The distinction between a "base offense level" under Chapter Two, and a plain "offense level" under Chapter Four, is derived from the same guideline text that has produced this circuit's fifteen-year practice of referring to the career offender's "base" offense level. In this sense, the utility and viability of the majority's proffered distinction has already been foretold; it is empirically denied.

The prevailing meaning of the phrase "offense level" in the career offender guideline suggests that when the Assistant United States Attorney (AUSA) and Martinez-Noriega agreed to a "base offense level," they were agreeing to preclude the application of the career offender guideline, which supplants the base offense level specified in the plea agreement. Accordingly, I dissent.

---

("any ambiguities" in plea agreements "will be read against the Government and in favor of a defendant's appellate rights"); *Cosimi,* 2005 U.S. Dist. LEXIS 8900, at *18 ("plea agreements, which are drafted by the Government, are construed strictly against the government") (internal quotation marks and citation omitted).

Even if the majority's flimsy distinction between a "base offense level" and an "offense level" is correct, the majority's holding should not be applied retrospectively to Martinez-Noriega, whose plea agreement was clearly negotiated during an era when the career offender guideline was presumed to set a "base" offense level that supplanted the "base" offense level designated in Chapter Two of the guidelines.

-14-

- **Public Policy Considerations**

In my view, the district court never should have accepted this one-sided, open-ended plea agreement; it should have forced the AUSA to negotiate fairly with Martinez-Noriega from the start, by specifying clearly the meaning of the term "base offense level," the sentencing range at issue, and any as-yet-unresolved factors to which the parties would not stipulate (e.g., criminal history).

A contract is unenforceable, or even void, where it runs contrary to public policy. *See McBrearty v. U.S. Taxpayers Union*, 668 F.2d 450, 450-51 (8th Cir. 1982); 15-79 CORBIN ON CONTRACTS § 79.1 (2004). The guidelines articulate several policy statements governing the quality and specificity of plea agreements which must be satisfied before a court of law can approve the agreement. *See* U.S.S.G. § 6B1.2 (listing standards for acceptance of plea agreement). Stipulations to plea agreements are likewise held to certain standards. *See* U.S.S.G. § 6B1.4. Stipulations are supposed to identify, with "***meaningful specificity***," a "sentencing range." U.S.S.G. § 6B1.4(a)(3) (emphasis added). The stipulation must also explain why that sentencing range is "appropriate." *Id.* The commentary following this policy statement further admonishes that plea agreements "must ***fully and accurately disclose all factors relevant to the determination of a sentence***." *Id*. at cmt. (emphasis added). The policy statements contained in the guidelines are "well defined and dominant," and are not merely ascertained "from general considerations of supposed public interests." *W.R. Grace & Co. Local Union 759,* 461 U.S. 757, 766 (1983) (citations omitted). The AUSA should be intimately familiar with these policies.

The plea agreement in this case lacked "meaningful specificity" and full and accurate disclosure of all relevant sentencing factors because it did not identify Martinez-Noriega's criminal history, much less propose a sentencing range. If the Government is allowed to omit criminal history and a sentencing range, the parties

are not forced to discuss the implications that criminal history might have upon the ultimate sentence. This means the Government is essentially inducing defendants into making plea agreements before they are fully informed as to what will happen to them if they plead guilty versus what will happen to them if they proceed to trial. This is wrong. I am not suggesting that the Government must actually *reach agreement* on every factor that could impact a sentence; an AUSA can certainly identify a factor critical to sentencing, warn the defendant clearly that the factor may increase the severity of the defendant's sentence such that it could effectively nullify the benefit of the plea deal, and state clearly that no agreement has been reached between the parties as to that term. But if the Government is going to make plea agreements and stipulations, it must be forthcoming and identify "all factors relevant to the determination of a sentence," U.S.S.G. § 6B1.4 at cmt., especially the detrimental effect that one's criminal history may have upon a sentencing range.[4] The AUSA opined that he must always leave terms open in a plea agreement because he is never 100 percent certain of what pre-trial services will uncover about a given defendant. That argument fails miserably. First, the guidelines anticipate this scenario and instruct the drafter of the stipulations to identify "all areas of agreement, disagreement, and *uncertainty that may be relevant to the determination of a sentence*." U.S.S.G. § 6B1.4 cmt.; *see also id.* at § 6B1.4(b). "Full disclosure" is the objective. *Id. at cmt*. If the AUSA was not 100 percent sure of what pre-trial services would uncover about Martinez-Noriega, the plea agreement should have identified those remaining areas of uncertainty that could have impacted Martinez-Noriega's

---

[4]The majority implies that since the defendant "is uniquely qualified to know his own criminal history," it is his or her responsibility to "seek to negotiate an understanding about the criminal history provisions." Majority opinion at 5. But this assumes that defendants are aware of the career offender guideline and how it works, and that defendants understand the difference between a "base offense level" and an "offense level" – a preposterous series of assumptions indeed, considering that this circuit, for over a decade, has apparently missed the distinction made by the majority in this case. At any rate, it is not the defendant's burden to establish that he or she is a career offender; it is the Government's burden.

sentence. Of course, in this case the AUSA's argument is disingenuous at best because (1) the AUSA admitted in open court that he could have verified Martinez-Noriega's criminal history if he felt like it, and (2) Martinez-Noriega argued in his brief and at oral argument that the AUSA knew his criminal history and the Government did not dispute this. Most importantly, the AUSA's justification fails because it does not explain why an AUSA must wait to obtain the contents of a pre-sentence report (PSR) until after a defendant is induced into pleading guilty.

The system does not have to work this way. It makes little sense to craft a plea agreement before knowing the important information relevant to sentencing. Under the present scheme, defendants are commonly presented with some new factor (after pleading guilty) that was not discussed in the plea negotiations and which inevitably lengthens the sentence. Making plea deals before the AUSA possesses all the information is a problematic tactic that almost always inures to the benefit of the AUSA, who is highly unlikely to admit that an augmented sentence would be improper.

The AUSA in this case failed to justify his poor handling of this case. I doubt that a solid justification exists because the practice is at odds with an AUSA's duty to the Government. As the Third Circuit has said,

> Our criminal justice system is bottomed on several unwavering principles. One of those principles was recognized long ago by Justice Sutherland when he stated that a prosecuting attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, [a prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. [One] may prosecute with earnestness and vigor–indeed, [one] should do so. But, while [a prosecutor] may strike

-17-

hard blows, he [or she] is not at liberty to strike foul ones. It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*Dunn v. Colleran*, 247 F.3d 450, 451 (3d Cir. 2001) (*quoting Berger v. United States*, 295 U.S. 78, 88-89 (1935), *overruled on other grounds by Stirone v. United States*, 361 U.S. 212 (1960)). Likewise, an AUSA has a duty to refrain from improper methods calculated to produce plea agreements based on less than full and fair disclosure.

Because the AUSA failed to handle this case in a forthcoming manner, confusion and an appeal resulted. The AUSA's conduct contributed directly to an unnecessary usurpation of judicial resources and federal revenue. Such inefficiencies will continue unless this court and our sister jurisdictions require plea agreements to conform to the express public policy of the guidelines. There is no reason why plea agreements cannot contain clear, full and accurate disclosures of factors relevant to sentencing, including a good faith recommendation on the sentencing range which the Government seeks. Doing so would obviate the need for a great number of criminal sentencing appeals.

This court's refusal to intervene and stop the AUSA's tactics is deeply troubling. The district court's sentence should be vacated and this matter remanded for re-sentencing pursuant to a base offense level of 20 and the district court should be instructed not to apply the career offender guideline. In addition, because plea agreements such as the one agreed to here are contrary to public policy, this court should hold that from this point forward, district courts must require plea agreements to (a) fully and accurately disclose all factors relevant to the determination of a

sentence, and (b) identify an appropriate sentencing range with meaningful specificity.

For the above-stated reasons, I dissent.

_____