# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 5, 2009   Decided March 26, 2010

No. 08-1243

COLORADO INTERSTATE GAS COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Howard L. Nelson* argued the cause for petitioner. With him on the briefs was *Kenneth M. Minesinger. Stephanie D. Neal* entered an appearance.

*Robert M. Kennedy*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor.

Before: GARLAND and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Petitioner, Colorado Interstate Gas Company (CIG) operates a natural gas pipeline that includes a gas storage facility in Fort Morgan, Colorado. An accidental leak at the Fort Morgan facility led to the loss of a substantial amount of gas, which CIG asked its shippers to replace. The shippers refused, and the Federal Energy Regulatory Commission (FERC) took their side in the orders on review. FERC held that under its tariff CIG could only recover from its shippers gas that was lost in the course of normal pipeline operations, which this was not. We deny CIG's petition for review because FERC's interpretation of the tariff was reasonable, and its conclusion that the loss did not result from normal operations was supported by substantial evidence.

**I.**

At 12:30 p.m. on October 22, 2006, CIG learned of a gas leak at its Fort Morgan facility when a nearby landowner "noticed water coming to the surface within the boundaries" of CIG's facility. Affidavit of Larry D. Kennedy, Jr., at 1. CIG immediately initiated its "Emergency Operating Procedures" and designated Larry D. Kennedy, Jr., CIG's Manager of Reservoir Services, as its "Incident Response Commander." *Id.* Two hours after first learning of the leak, CIG identified the #26 gas well as the source. At approximately 7:00 p.m., CIG inserted a cast iron bridge plug into the tank, which prevented additional gas from escaping.

CIG notified federal, state, and local authorities, as required by the various regulations that govern unexpected releases of natural gas. In the immediate aftermath of the leak, CIG "communicated with the public and local authorities by the use of newsletters, E-Mails, and public meetings on a

regular basis," and the pipeline established a "hot-line" for concerned citizens. *Id.* at 3. Days later, as an added precaution, CIG inserted a second plug to ensure the leak was completely stopped. During a subsequent investigation, CIG discovered that the leak had been caused by a crack in the tank's casing approximately 847 feet below ground level.

The amount of gas lost at Fort Morgan was substantial—between 451,000 and 720,000 decatherms—and this dispute stems from CIG's attempt to recover gas from its shippers to offset the loss. Whether CIG may recover this loss depends on the language of its tariff.

The amount of gas a shipper delivers to a pipeline will never be exactly the same as the amount of gas that arrives at the destination. In the course of moving gas from one place to another, some of it is lost due to small leaks or metering errors. Gas lost in this way is known as lost and unaccounted-for gas. In addition, some gas is used by the pipeline to power the compressors that move the shippers' gas through the pipeline. This kind of gas is known as fuel gas. Both of these quantities vary substantially and unpredictably, which makes it difficult to know in advance what the cost of shipping will be. FERC permits a pipeline to adjust its tariff in two ways in an effort to provide more certainty to the pipeline's bottom line. Notice of Inquiry, *Fuel Retention Practices of Natural Gas Companies*, 72 Fed. Reg. 55,762, 55,762 (Oct. 1, 2007) [hereinafter Notice of Inquiry]; *see Am. Gas Ass'n v. FERC*, 593 F.3d 14, 17 (D.C. Cir. 2010). Each method involves the pipeline retaining a percentage of the gas shipped as a hedge against uncertain future costs.

First, the pipeline may include in its tariff a provision that fixes a percentage of the transported gas that may be retained. The percentage must be approved by FERC in a proceeding

under section 4 of the Natural Gas Act. *See* 15 U.S.C. § 717c(a) (2006). In section 4 proceedings, FERC generally considers every element of a pipeline's cost of providing service before approving the proposed retention percentage as just and reasonable. *See ANR Pipeline Co.*, 110 FERC ¶ 61,069, at 61,338 (2005). Under this approach, the retention percentage remains constant until the pipeline initiates another section 4 proceeding.

Second, a pipeline may include in its tariff a provision known as a fuel tracker, which tracks the amount of gas that is reimbursable and permits periodic changes to the retention percentage in what is known as a limited section 4 filing based upon the difference between what the pipeline estimated that amount to be and what it actually turned out to be. *See* 18 C.F.R. § 154.403 (2009); *ANR Pipeline Co.*, 110 FERC at 61,338–39; Notice of Inquiry, 72 Fed. Reg. at 55,762. In a limited section 4 proceeding, FERC evaluates the reasonableness of the proposed retention percentage based solely on the fuel tracker. This accelerated process allows the pipeline to quickly account for the gas that is reimbursable by avoiding the lengthy process of general section 4 review. Tariffs with fuel trackers must also include a "true-up provision," under which the pipeline either remits to the shippers any mistakenly retained gas or recovers additional gas if the initial retention percentage was insufficient to compensate the pipeline. *See ANR Pipeline Co.*, 110 FERC at 61,338–40.

CIG's tariff includes a fuel tracker, and four months after the Fort Morgan accident the pipeline made a limited section 4 filing with FERC seeking to increase its fuel retention percentage from 0.00% to 0.06%. The lion's share of the gas that CIG sought to recover was lost in the Fort Morgan leak. Several shippers protested CIG's filing,

contending that the Fort Morgan loss was unrecoverable. They argued that CIG could only increase its retention percentage to account for normal operating losses and not for accidents like the Fort Morgan leak. *See Colo. Interstate Gas Co.*, 121 FERC ¶ 61,161, at 61,719–20 (2007) [hereinafter *Order Following Technical Conference*]. FERC agreed, rejected CIG's proposed retention percentage, and accepted CIG's limited section 4 filing "subject to the removal of the . . . Fort Morgan gas loss." *Id.* at 61,724. CIG petitioned for rehearing, which FERC denied. FERC elaborated on the reasoning in its initial order, concluding that CIG's interpretation of its tariff was unreasonable, contrary to FERC precedent, and failed to account for the industry's usage of the term "lost, unaccounted-for" gas to refer to a discrete category of gas. *Colo. Interstate Gas Co.*, 123 FERC ¶ 61,183, at 62,237, 62,240 (2008) [hereinafter *Rehearing Order*].

CIG timely petitioned this court for review of FERC's decisions. We have jurisdiction under 15 U.S.C. § 717r(b). *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006).

## II.

The disposition of CIG's petition turns on FERC's interpretation of the tariff's fuel tracker to bar recovery for the gas lost in the Fort Morgan leak. We review a challenge to FERC's interpretation under the Administrative Procedure Act's arbitrary and capricious standard of review, using a two-step, *Chevron*-like analysis. *See* 5 U.S.C. § 706(2)(A); *Old Dominion Elec. Coop., Inc. v. FERC*, 518 F.3d 43, 48 (D.C. Cir. 2008). We first "consider *de novo* whether the [tariff] unambiguously addresses the matter at issue. If so, the language . . . controls for we must give effect to the unambiguously expressed intent of the parties." *Ameren*

*Servs. Co. v. FERC*, 330 F.3d 494, 498 (D.C. Cir. 2003) (internal quotation marks and citation omitted). "If the tariff language is ambiguous, we defer to the Commission's construction of the provision at issue so long as that construction is reasonable." *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814–15 (D.C. Cir. 1998).

We start by asking if the tariff clearly addresses whether CIG is entitled to increase its retention percentage due to the losses from the Fort Morgan leak. In a number of its provisions, the tariff describes circumstances in which the pipeline may recover from the shipper losses incident to the transportation of gas. We begin with Article 6.1, which states, "Shipper shall furnish Fuel Reimbursement as defined in Article 1 of the General Terms and Conditions." Colo. Interstate Gas Co., *FERC Gas Tariff*, at Fourth Revised Sheet No. 92. "Fuel Reimbursement," as defined in Article 1.30, "shall mean the compressor Fuel Gas and Lost, Unaccounted For and Other Fuel Gas as described in Article 42 of the General Terms and Conditions." *Id.* at Thirteenth Revised Sheet No. 230A. Neither party challenges that the tariff permits reimbursement for fuel gas, leaving for our resolution the meaning of the phrase "Lost, Unaccounted For and Other Fuel Gas as described in Article 42." Article 42, which is the tariff's fuel tracker, is entitled "Fuel and L&U" and describes the gas eligible for reimbursement as "Lost, Unaccounted For and Other Fuel '(L & U and Other Fuel).'" *Id.* at First Revised Sheet No. 380F, Original Sheet No. 380G. All gas eligible for reimbursement will be "stated in terms of a percentage of Receipt Quantities, computed and adjusted quarterly." *Id.* at First Revised Sheet No. 380F. This is the retention percentage.

CIG contends that these provisions clearly define the kinds of losses for which CIG may increase its retention

percentage. According to CIG, the comma that appears between "Lost" and "Unaccounted For" in Article 1.30 reveals that the tariff describes a three-item list of the types of gas that qualify for reimbursement: (1) lost gas; (2) unaccounted-for gas; and (3) other fuel gas.[1] *See* Petitioner's Br. at 26. CIG argues that the gas lost in the Fort Morgan leak is subject to reimbursement because it was "lost." This is a reasonable reading of Article 1.30, but it is incomplete. It fails to take into account the way Article 42 suggests that "lost, unaccounted-for" gas is a single category. In both its title, "Fuel and L&U," and its parenthetical, "L & U and Other Fuel," Article 42 uses the abbreviation "L&U" in ways that suggest "lost, unaccounted-for" gas is a discrete classification.

But neither view is compelling to the exclusion of the other. The tariff simply does not provide a clear answer to the question of whether a pipeline may recover any gas that is merely "lost." On this issue, the tariff is "reasonably susceptible of different constructions or interpretations," *Ameren Servs. Co.*, 330 F.3d at 499 (internal quotation marks omitted), and does not unambiguously establish what losses justify an increase in CIG's retention percentage.

We thus proceed to the second step of our *Chevron*-like analysis and assess the reasonableness of FERC's interpretation. FERC gave three reasons for its conclusion that CIG's tariff does not permit recovery for the Fort Morgan gas.

---

[1] "Other fuel gas" is gas that the pipeline uses for its own operations, excluding gas used to power machinery to transport gas. *See Colo. Interstate Gas Co.*, 128 FERC ¶ 61,117 at 61,614 n.5 (2009) ("'[O]ther fuel gas' . . . reflects gas consumed in processing activities, and is different from compressor fuel gas.").

First, FERC applied the industry understanding of the phrase "lost, unaccounted-for" gas. Rebutting CIG's argument that it may recover any gas that is merely "lost," FERC concluded that the comma between the words "lost" and "unaccounted-for" "does not change the trade usage and tariff understanding of L&U as a single term." *Rehearing Order*, at 62,241; *see also Transwestern Pipeline Co.*, 51 FERC ¶ 61,343, at 62,116 n.3 (1990) ("Lost and unaccounted for gas occurs from leakage, variations in metering at different locations and other reductions in the volume of gas transmitted . . . . incurred as part of a pipeline's daily operations."). Relying on the trade usage of the term is appropriate, as construing terms in light of their commonly understood meaning is a hallmark of reasonable interpretation. *See Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940, 945 (D.C. Cir. 1991); *see also United States v. Martinez-Noriega*, 418 F.3d 809, 815 (8th Cir. 2005) ("Trade usage of a term is also highly relevant to a determination of the parties' intended meaning."). We have consistently required that FERC interpret tariffs in light of their "commercial . . . context," and the Commission did so here. *Consol. Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1547 (D.C. Cir. 1985) (internal quotation marks omitted). CIG counters that FERC should never have considered trade usage because the terms of the tariff clearly establish the kinds of gas losses that are recoverable. *See* Reply Br. at 4. But as we have just explained, the tariff was not clear on this point, and FERC rightly looked to this kind of extrinsic evidence. With such ambiguity, we afford FERC "substantial deference . . . even where the issue simply involves the proper construction of language." *Koch Gateway*, 136 F.3d at 814 (internal quotation marks omitted). FERC relied on its understanding of industry parlance and reasonably construed the tariff's use of "L&U."

Second, FERC's interpretation of the fuel tracker ensures that no provision of the tariff lacks legal effect. FERC noted that CIG's contrary interpretation would render meaningless the Commission's "review of CIG's quarterly L&U and fuel gas reimbursement percentage true-ups" under Article 42.5. *Order Following Technical Conference*, at 61,722. Article 42.5 of CIG's tariff requires the pipeline to reconcile the actual amount of gas retained under the prevailing retention percentage with the amount of gas that qualifies under the fuel tracker. If CIG could recover any loss at all—including catastrophic, abnormal losses—FERC would never need to examine CIG's data offered in connection with its true-ups. *See id.* CIG's proposed interpretation renders the true-up provision of the fuel tracker a nullity, whereas FERC's interpretation does not. FERC reasonably gave effect to all the tariff's provisions—yet another maxim of reasonable interpretation. *See* RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (2009) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part . . . of no effect.").

Third, FERC's construction of CIG's tariff is consistent with how FERC has approached recovery claims for lost, unaccounted-for gas under other fuel trackers. In particular, FERC employed the test announced in *Williams Natural Gas Co.*, 73 FERC ¶ 61,394, at 61,215 (1995), which involved the application of a similar fuel tracker. In *Williams*, FERC "put forth a standard for recovering losses in tracking mechanisms that described two categories of losses: losses resulting from normal pipeline operations, which are recoverable; and losses resulting from the malfunction of underground storage mechanics, which are not recoverable in an L&U tracking mechanism." *Rehearing Order*, at 62,239. Following *Williams*, FERC determined that the key factual determination

in this case was whether the Fort Morgan loss more closely approximated a normal operating loss, which is recoverable, or an abnormal malfunction of underground storage mechanics, which is not. We give deference to FERC's interpretations of its own precedents and conclude that it was reasonable for FERC to use the approach sanctioned in *Williams* to determine the outcome here. *See NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 799 (D.C. Cir. 2007).

In contrast, CIG argues that FERC has departed from its precedents. CIG reads these cases to limit FERC's inquiry to the prudence of the pipeline's actions when considering if lost gas is eligible for reimbursement. *See* Petitioner's Br. at 20–24. But CIG misreads those decisions. In the case upon which CIG relies most, *High Island Offshore System, LLC (HIOS)*, 118 FERC ¶ 61,256 (2007), FERC permitted the pipeline to change its retention percentage because the reported level of lost and unaccounted-for gas was "not an anomaly." *Id.* at 62,235. Critically, however, the Commission in *HIOS* did not purport to describe the types of costs that are eligible for recovery, whereas *Williams* provided just such a holding. By following the rule outlined in *Williams*, FERC did not unlawfully diverge from its precedents.

Additionally, CIG maintains that FERC's interpretation was unreasonable because the *Williams* distinction between "normal" and "unusual" is not rationally related to whether a pipeline could increase its retention percentage. The pipeline argues that this standard "deprives CIG of an opportunity to recover its prudently incurred costs." *See* Petitioner's Br. at 14. This argument fails for two reasons. First, it wrongly implies that such losses are never recoverable. The decisions below made no such prohibition and concluded simply that CIG could not recover these costs through a limited section 4 filing. FERC left open the possibility that a pipeline could

recover losses like those at Fort Morgan in a regular section 4 case.[2] *See Rehearing Order*, at 62,240. Second, the standard announced in *Williams* and applied below is rationally related to whether a pipeline can use an accelerated procedure without the lengthy investigation entailed in a section 4 case. By only permitting recovery for normal operating losses, FERC and the parties save the time and resources required to undertake a general rate case for frequently recurring expenses. The pipeline and its shippers reasonably anticipate that normal costs will occur each year, and the limited section 4 filing ensures that both parties can quickly resolve these claims.

## III.

We turn finally to CIG's contention that FERC was arbitrary and capricious in determining that the Fort Morgan loss was not a normal operating event. This court "uphold[s] FERC's factual findings if supported by substantial evidence." *Wash. Gas Light Co. v. FERC*, 532 F.3d 928, 930 (D.C. Cir. 2008) (internal quotation marks omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The circumstances of the Fort Morgan incident amply support FERC's finding that this accident, which led to substantial gas loss over the period of a few days, was not

---

[2] As part of a prior settlement agreement, CIG has agreed to a moratorium on section 4 actions. *See* Petitioner's Br. at 4 n.1. That CIG has voluntarily taken that option off the table has no impact on what FERC is required to do under the law.

normal. FERC reasonably described the accident as "a totally unexpected non-routine malfunction of underground storage mechanics . . . not associated with routine maintenance or other normal operations activity." *Order Following Technical Conference*, at 61,723. Indeed, CIG responded by initiating "Emergency Operating Procedures" and establishing a hot-line for concerned residents of the area. A reasonable person could accept this evidence as adequate to conclude the Fort Morgan incident was not part of CIG's "normal pipeline operations." FERC's determination was supported by substantial evidence.

## IV.

For the foregoing reasons, the petition for review is

*Denied.*