# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued October 18, 2013        Decided December 3, 2013

No. 12-1158

SOUTHWEST POWER POOL, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

AMERICAN ELECTRIC POWER CORPORATION, ET AL.,
INTERVENORS

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

*Barry S. Spector* argued the cause for petitioner. With him on the briefs was *Jeffrey G. DiSciullo*. *Ryan J. Collins* entered an appearance.

*Sean T. Beeny*, *Barry Cohen*, *Amanda Riggs Conner*, *N. Beth Emery*, *Noel Symons*, *Lisa Sharp*, *David W. D'Alessandro*, *M. Denyse Zosa*, *Gary Newell*, and *Rebecca Sterzinar* were on the brief for joint intervenors in support of petitioner. *Matthew A. Fitzgerald* entered an appearance.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, Acting General Counsel, and *Robert H. Solomon*, Solicitor.

*Stephen L. Teichler* argued the cause for intervenors Midwest Independent Transmission System Operator, Inc. and Entergy Services, Inc. in support of respondents. With him on the brief were *Ilia Levitine*, *John S. Moot*, and *Gregory W. Camet*.

Before: TATEL AND GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: This dispute between two regional transmission organizations ("RTOs") turns on the interpretation of a single contract provision. The Federal Energy Regulatory Commission resolved the conflict against petitioner Southwest Power Pool ("SPP"). Applying both the Administrative Procedure Act and the "*Chevron*-like analysis" that governs review of such an interpretation, *Colorado Interstate Gas Co. v. FERC*, 599 F.3d 698, 701 (D.C. Cir. 2010), we find that the Commission failed to provide a reasoned explanation for its decision. It leapt to an interpretation of one item of evidence without explaining its implicit rejection of alternative interpretations, and, equally without explanation (or at least adequate explanation), it disregarded evidence that the applicable law required it to consider. See Order on Petition for Declaratory Order, 136 FERC ¶ 61,010 (2011) ("Order"), rehearing denied, Order on Rehearing, 138 FERC ¶ 61,055 (2012) ("Order on Rehearing"). Accordingly, its decision was arbitrary and capricious, and we vacate and remand the orders.

3

\* \* \*

SPP is an RTO adjacent to another RTO, the Midwest Independent Transmission System Operator ("MISO"), recently renamed Midcontinent Independent System Operator, evidently to reflect its continuing expansion to the south. Entergy Arkansas, an operating subsidiary of Entergy Corporation and at the time of the petition not part of any RTO, abuts both SPP and MISO.

In 2011 Entergy Arkansas made a regulatory filing addressing the possibilities of joining MISO or SPP, and indicating a preference for MISO. Order, 136 FERC ¶ 61,010 at P 7. That preference rested at least in part on the considerable savings in production costs that joining MISO would yield relative to joining SPP. Entergy Corp., *RTO Path for Entergy Operating Companies* 4, 9; Joint Appendix ("J.A.") 225, 230. To realize those savings, however, MISO must be able to move to Entergy Arkansas electricity generated elsewhere in MISO. Although Entergy Arkansas has transmission connections to both SPP and MISO, its connection to MISO is relatively limited compared to those to SPP and others. MISO would therefore need to rely on these other, non-MISO transmission providers. MISO believes that its Joint Operating Agreement ("JOA") with SPP gives it the *right* to rely on SPP's transmission facilities to do so, *even after Entergy Arkansas becomes part of MISO itself*, an event that appears imminent—Entergy Arkansas has received multiple regulatory approvals to join MISO. See Press Release, Entergy Corp., *APSC Issues Final Conditional Order on Entergy Arkansas' MISO Integration* (Apr. 11, 2013). Section 5.2 of the JOA, the provision invoked by MISO, provides:

> **Sharing Contract Path Capacity**. If the Parties have contract paths to the same entity, the combined contract

path capacity will be made available for use by both Parties. This will not create new contract paths for either Party that did not previously exist. SPP will not be able to deal directly with companies with which it does not physically or contractually interconnect and the [MISO] will not be able to deal directly with companies with which it does not physically or contractually interconnect.

The parties agree that at the time of FERC's decision, with Entergy Arkansas distinct from MISO, both RTOs had "contract paths to the same entity," to wit Entergy Arkansas. Thus Section 5.2 allowed one RTO to use the other's transmission network to move electricity to Entergy Arkansas. That is where agreement ends.

The alternative readings of Section 5.2 are these: MISO understands "contract path to the same entity" to include any physical or contractual interconnection and to apply regardless of whether the "entity" is a part of either RTO. So, even if Entergy Arkansas becomes part of MISO, Entergy Arkansas will (under MISO's view) be an "entity" to which both RTOs have contract paths. SPP argues that an RTO cannot have a "contract path to" itself or to *part* of itself. Thus, once Entergy Arkansas joins MISO, Section 5.2 will no longer (under SPP's view) apply, despite the existence of a "physical or contractual" interconnection between the part of MISO made up of Entergy Arkansas and the other parts of MISO.

After the parties negotiated for some time in vain, MISO petitioned FERC for a declaratory judgment on the interpretation of Section 5.2. FERC adopted MISO's reading, finding that the term "contract path" was broad enough to encompass any physical or contractual interconnection, and that "entity" could include any operating entity, whether or not it was part of one of the RTOs. Order, 136 FERC ¶ 61,010 at PP 61-62; Order on Rehearing, 138 FERC ¶ 61,055

at P 19. We discuss the details of the Commission's decision as they become relevant.

* * *

Before reaching the merits of SPP's arguments, we must first address FERC's assertions that SPP lacks standing and that, in any case, its claims are unripe.

On standing, FERC contends that SPP's interest in the interpretation of Section 5.2 is too attenuated to create an injury that is "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). It says that no harm will ensue for SPP unless Entergy Arkansas elects to join MISO and secures the necessary state and federal approval, and MISO then seeks to use Section 5.2 to transmit electricity to Entergy Arkansas. Thus FERC characterizes SPP's injury as "too speculative."

We have held that an agency interpretation that defines contractual rights and obligations may itself create enough of an injury to confer standing on a party to that contract. See *Dominion Transportation, Inc. v. FERC*, 533 F.3d 845, 852 (D.C. Cir. 2008). We need not explore the scope of that decision, because the Commission's decision here cast a very present shadow over the three-way maneuvering between SPP, MISO and Entergy Arkansas. The latter's parent corporation (Entergy) proclaimed in its 2011 presentation on joinder with MISO that "[r]esolution of the JOA issue in MISO's favor would increase the potential production cost savings and further tip the benefit ratio in MISO's favor." Entergy Corp., *RTO Path for Entergy Operating Companies* 9; J.A. 230. It is surprising that FERC should think that standing rules require SPP to remain in limbo while its competitor MISO woos Entergy Arkansas with FERC's

assurance of access to SPP's infrastructure—an assurance that SPP believes is unlawful.

FERC's ripeness argument fares no better. Ripeness of course typically involves an inquiry into the fitness of the issues for judicial review and the hardship to the parties of withholding that review. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). But a showing of hardship is ordinarily unnecessary where the agency "has suggested no institutional interests in postponing review . . . , and adjudication will not benefit from additional facts." *Pub. Serv. Elec. & Gas Co. v. FERC*, 485 F.3d 1164, 1168 (D.C. Cir. 2007).

Neither SPP nor FERC has suggested a need for further factual development. And although FERC insists that it may address "implementation" issues in a subsequent proceeding, it nowhere suggests that its interpretation of Section 5.2 has not crystallized enough for this court's review. *Burlington N. R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 691 (D.C. Cir. 1996). Instead, the Commission repackages its standing argument, asserting that many "contingencies" lie between the order under review and any harm to SPP, rendering the order unripe. Our discussion of standing of course dooms that argument.

\* \* \*

Our review of the Commission's decision in the end does not call on us to answer the "*Chevron*-like" question whether FERC has adopted a "reasonable interpretation" of the contract—"not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009); *Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183, 186 (D.C. Cir. 2013). Here FERC's treatment of the issue founders on APA principles—the requirements that it

"examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines Inc. v. United States*, 371 U.S. 156, 168 (1962)). Agency action that fails either requirement is arbitrary and capricious. *Id.*

Neither SPP nor FERC contends that Section 5.2's meaning is unambiguous. Although FERC attempts to draw meaning from a couple of terms, its theme is only that they do not preclude MISO's preferred interpretation. Only Intervenor MISO contends that the text is in fact unambiguous. But its argument consists largely of declarations that if the parties intended SPP's interpretation, they could have made that clear. Of course; the parties' potential ability to make a provision clear is a universal characteristic of ambiguity. But it hardly establishes that the parties affirmatively made MISO's preferred reading clear. Agreeing with SPP and the Commission that Section 5.2 is ambiguous on the relevant issue, we turn to the process by which the Commission sought to resolve that ambiguity.

SPP raises two principal complaints about FERC's decisionmaking, first, that the Commission misinterpreted the evidence on which it relied and, second, that it erred in refusing to consider relevant evidence before it.

FERC relied heavily on what it termed "course of performance" evidence, to wit the only prior use of Section 5.2—a transaction between MISO, SPP, and a third party, coincidentally, Entergy Arkansas. The particular circumstances of the transaction are critical.

It is undisputed that both SPP and MISO have (or at least had at the relevant times) contract paths to Entergy Arkansas

within the meaning of Section 5.2. MISO's is an interchange agreement between MISO (in the form of a MISO transmission owner, Ameren Company), Entergy Arkansas and a third party. Order, 136 FERC ¶ 61,010 at P 3; Affidavit of Carl A. Monroe on behalf of SPP ¶ 12; Affidavit of Thomas J. Mallinger on behalf of MISO ¶ 13. During a period when that contract path was out of order, MISO used SPP's path *to* Entergy Arkansas in order to "allow Ameren to continue to serve its radial load on the Entergy transmission system." Mallinger Aff. ¶ 13; Order on Rehearing, 138 FERC ¶ 61,055 at P 20.

The Commission regarded this episode as supporting MISO's view of Section 5.2. Though acknowledging that it was a "use of SPP's path to Ameren through SPP and across Entergy Arkansas," the Commission seemed to find decisive the fact that the path in question "was still used to provide transmission service to Ameren, an internal MISO operating member." Order on Rehearing, 138 FERC ¶ 61,055 at P 20.

Thus, so far as we can see, FERC acknowledges that the only *service* provided by SPP under Section 5.2 was between MISO and a third party, Entergy Arkansas. Why it is important that the MISO member using this service then went on to reach its own operating area via Entergy Arkansas is never explained. The service SPP provided appears consistent both with its view of Section 5.2 and with MISO's broader view (though not in any way *relying on* that broader view). Given the episode's apparent complete consistency with both parties' competing views, we are at a loss to see why FERC regarded the episode as decisive in favor of MISO. Its unexplained leap from neutral evidence to a decision in favor of one side rendered its order arbitrary and capricious.

FERC's confident reading of the single use of Section 5.2 led it to dismiss additional types of evidence offered by SPP.

First, SPP introduced an affidavit by Carl Monroe, SPP's chief negotiator for the JOA, stating that at the time of the negotiations, SPP understood that Section 5.2 would apply only when the electricity was transmitted to a third party, not when it was delivered to part of the originating RTO. Monroe Aff. ¶ 15. Second, SPP pointed to definitions of "contract path" used by the North American Electric Reliability Corporation and the North American Energy Standards Board. It urged the relevance of these by pointing to our statement that "[r]elying on the trade usage of [a] term is appropriate, as construing terms in light of their commonly understood meaning is a hallmark of reasonable interpretation." *Colorado Interstate Gas Co. v. FERC*, 599 F.3d at 703 (quoted in SPP's Request for Rehearing at 10 n.27, J.A. 333). The trade materials SPP cited are replete with words of art, and without the Commission's having explored them at all we are in no position to assess their force in support of SPP's contention.

FERC, however, "decline[d] to consider" these materials. It observed, correctly, that the Restatement (Second) of Contracts § 203(b) and Delaware law (agreed by the parties to be controlling) accord "greater weight" to course of performance evidence than to evidence based on usage of trade or course of dealing (as FERC characterized the Monroe Affidavit). In a literal sense, of course, FERC afforded "greater weight" to course of performance evidence, as it accorded no weight at all to any other. See Order on Rehearing, 138 FERC ¶ 61,055 at PP 21-22 ("declin[ing]" to consider either type of evidence). But FERC points to nothing in Delaware law or the Restatement supporting total disregard of either type of extrinsic evidence. We may assume arguendo that in some instances course of performance evidence would be so overwhelming as to justify disregard of other evidence, but the seemingly neutral impact of the single episode of Section 5.2's use makes any such assumption

irrelevant. Thus, together with its unexplained reading of that episode, the Commission's complete failure to consider the evidence proffered renders its orders arbitrary and capricious.

* * *

The orders are therefore

*Vacated and remanded.*